FRANCIS T. WHEELER *et al.*

*v.*

THE PULLMAN IRON AND STEEL COMPANY *et al.*

*Filed at Ottawa October 31, 1892.*

1. CORPORATIONS—*jurisdiction of courts of equity to dissolve.* In the absence of statutory authority, courts of chancery have no jurisdiction to decree the dissolution of a corporation by declaring a forfeiture of its franchise, either at the suit of an individual or of the State. The mode of enforcing a forfeiture of the charter, at common law, was by *scire facias* or *quo warranto* in courts of law only, and at the suit, only, of the sovereign.

2. SAME—*power to vest courts of equity with jurisdiction to dissolve.* The power to confer jurisdiction upon courts of equity, at the suit of creditors, etc., to declare the forfeiture of corporate franchises and dissolve corporations, as one of the reserved powers of the State over such bodies, is well recognized in this State. Whenever the power of the court of equity has been properly invoked, its jurisdiction has been sustained.

3. SAME—*sufficiency of bill to dissolve and wind up its affairs.* A bill filed by a stockholder of a private corporation to have a receiver appointed and the affairs of the corporation wound up and the corporation dissolved, is bad, on demurrer, if it does not allege or set out facts showing the existence of any of the causes named in the statute as grounds of equitable interference. If the bill, instead of invoking the powers conferred by the statute, appeals to the general chancery powers of the court, it will not be sufficient.

4. SAME—*dissolution—part of section 25 of the act construed.* The second clause of section 25 of the act relating to corporations, which gives courts of equity power to dissolve a corporation "on good cause shown," is not intended to confer jurisdiction whenever the interests of the stockholders, or any of them, in equity and good conscience demands the exercise of the power. Such provision is intended to enable the court, in all cases in which the jurisdiction of the court is properly invoked under the statute, to afford complete relief.

5. By the first clause of the section a remedy is provided by which the assets of the corporation, in the cases enumerated in the statute, may be applied in payment of its liabilities, and if insufficient therefor, holders of unpaid stock of the corporation may be compelled to contribute to the payment of any balance of corporate indebtedness after

the application of the corporate effects, without first obtaining a judgment of forfeiture at law.

6. SAME—*power of court to wind up affairs.* No judgment forfeiting the charter of the corporation is necessary to authorize the court to grant this relief, but by the later provisions the court may, in cases where cause of forfeiture exists, declare the same, and by its decree dissolve the corporation, and through its receiver administer and distribute the corporate estate, thus making the remedy in equity, in such cases, complete.

7. The "good cause" for dissolving a corporation is necessarily a legal cause, for which the State, or the sovereign authority, may by law resume the franchise granted. It can not be presumed that the legislature intended, by the language of this section, to authorize a decree forfeiting the corporate franchise for causes for which the State might not procure judgment of forfeiture at law.

8. SAME—*disposition of assets on dissolution.* The assets of a trade corporation, independent of statutory provision, and notwithstanding its dissolution, belong to those who contributed to its capital, and for whom it stood as representative in the business in which it was engaged, and such assets are treated, in equity, as a trust fund, to be administered for the benefit of the *bona fide* holders of stock, subject to the just claims of creditors of the corporation.

9. SAME — *remedy of stockholder for mismanagement and fraud in officers of the company.* It is well settled that if the agents of a corporation in whom the authority to control its affairs is vested, are themselves guilty of wrong against the corporation, either by personal conversion of its funds or being interested in another corporation or business, and fraudulently manage the affairs of the corporation to its detriment and for the benefit of such other corporation or concern, a court of equity will, upon proper bill filed, interpose, at the suit of a stockholder, to protect his interest, without requiring him to first request or demand that the guilty agents proceed virtually against themselves.

10. SAME—*rights of majority of stockholders to control and manage corporate affairs.* It is a fundamental principle in the law of corporations, that a majority of the stockholders of a corporation shall control its policy and regulate and control the lawful exercise of its franchise and business. Each stockholder impliedly agrees to be bound by the acts of a majority of the stockholders, or by the agents of the corporation duly chosen by such majority, within the scope of the charter powers conferred.

11. SAME—*control of its business by the courts.* A court of equity will not assume to control the policy or business methods of a corporation, although it may be seen that a wiser policy might be adopted. The

majority of its stock, or the agents, by the holders thereof duly chosen, must be permitted to control the business of the corporation in their discretion, when not in violation of its charter or some public law, or corruptly and fraudulently subversive of the rights and interests of the corporation or of a stockholder.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. HENRY M. SHEPARD, Judge, presiding.

Appellants filed their bill in the Superior Court of Cook county, against the Pullman Iron and Steel Company, the Pullman Palace Car Company, the Pullman Loan and Savings Bank, George M. Pullman, and others, alleging, in substance, that in October, 1883, Frank B. Felt, James P. Perkins, George M. Pullman and John W. Doane were equal owners of a certain patent for the making of railway spikes; that such persons, for the purpose of manufacturing under said patent, organized and incorporated, under the laws of Illinois, the "Pullman Iron and Steel Company," with a capital of $500,-000 divided into 5000 shares of $100 each; that said capital stock was ostensibly paid in full by the transfer to the company of said patent and certain experimental machinery, which was of no value. Certificates of full paid stock were issued,—$125,000 to each of said parties,—one-half of which, that is, $62,500 by each, was returned to the company to be sold, and the proceeds to be used as a working capital. Of this stock, 1625 shares ($162,500 face value) were sold, from which was realized $100,000 in money, of which stock Fisher and Wheeler, complainants, each purchased and still owns $5000. The company erected works costing $116,000, being $16,000 in excess of cash realized from sale of stock, and to meet the deficit and provide operating capital, bonds of the company to the amount of $100,000 were issued, secured by mortgage upon its property, etc. Of these bonds $25,000 were sold at par. It was found that the manufacture of spikes, to a limited extent, only, was practicable, and was substan-

tially abandoned, and the principal business of the company was changed to the manufacture and sale of bar iron.

The company borrowed of the Pullman Loan and Savings Bank, (of which George M. Pullman was and is president and principal stockholder;) from time to time considerable sums of money, there remaining unpaid thereof, at the filing of the bill, $56,500. In December, 1886, by resolution of the board of directors of the company, the remaining $75,000 of the bonds of the company, were ordered to be delivered to the said bank, which now claims to hold the same as collateral to such indebtedness of the company. In September, 1885, the company owed said bank about the same amount that it owed it at the filing of the bill, "and its affairs being in a desperate condition, Pullman caused the Pullman Palace Car Company, another corporation * * * of which he was and is also president, to give the iron and steel company a line of credit, whereby it was enabled to purchase material and to continue in operation, and which has continued to the filing of the bill; that by virtue thereof the iron and steel company has been enabled to make large purchases of iron and other material, and to build large additions to its works for the manufacture of iron required by said Pullman Palace Car Company; that George M. Pullman, as the controlling stockholder of the iron and steel company, and the president of the Pullman Palace Car Company, directed and ordered the entire business of the iron and steel company almost solely for the benefit of the palace car company, and dictated prices at which the iron and steel company should furnish its product to the car company, which prices were so low that little or no profit was realized."

It is also alleged that if the iron and steel company had been allowed to manufacture bar iron, and sell to the trade at market prices, it would have realized large profits, and been enabled "to discharge or largely reduce its indebtedness," but that "it is irretrievably and hopelessly insolvent, with liabilities in excess of $300,000, about $180,000 of which is claimed

by its officers to be due the palace car company." It is then alleged that at the annual meeting of stockholders of the iron and steel company held in 1886, and again in 1887, George M. Pullman (being the owner of a majority of the stock of the company) directed the election of certain persons, who are named, as directors of said company, and who were either officers or employes of the palace car company, and by like direction certain of the persons so chosen directors were elected president, secretary and treasurer of the company; that "the whole management of the company is under the control of the Pullman Palace Car Company, and George M. Pullman, as its president; that none of the officers or directors of the iron and steel company have any pecuniary interest therein, but hold their positions by direction of Pullman, and subject to his absolute control and direction; that the stock held by them is held for and in fact owned by Pullman; that the patent transferred to the company in ostensible payment for the subscriptions to its capital stock is worthless and has been abandoned, and that the only value paid for any stock was the $100,000 received in payment for the 1625 shares, before mentioned as sold, which has been totally lost in the business; that at the annual meeting in 1887 a statement showing the financial condition of the company was prepared, from which it appeared that the assets, including the plant, amounted to $279,618.19 and the liabilities to $302,256.07, thus showing, as alleged, that its liabilities exceeded all assets over $20,000; that at the next annual meeting, being the one held next before the filing of the bill, the like statement showed assets $290,046.60 and liabilities $302,179.11,—an excess of liabilities over assets of over $12,000. It is then alleged that in order that justice be done an account should be taken between the iron and steel company and the said palace car ·company and said bank, and charges that after the said iron and steel company shall have been given proper credits for the product of its manufacture sold to said palace car company,

on the basis of what such product was reasonably and fairly worth in the market at the times of such sales, it "will be found to be indebted to said Pullman Palace Car Company in a sum greatly less than the amount now claimed by said palace car company."

The prayer is that the corporation be dissolved and its business closed up; that a receiver be appointed; that an accounting be had between "the parties aforesaid, growing out of the matters and things aforesaid;" that the assets of the corporation be marshaled and its liabilities ascertained, and the liability of its stockholders to the corporation or to its creditors be found and they be decreed to pay the same, and after the payment of liabilities of the corporation, the balance, if any, be divided *pro rata* among the stockholders, etc. A demurrer was interposed to the bill, and sustained, and the bill dismissed. On appeal to the Appellate Court this decree was affirmed, and complainants prosecute this further appeal.

Messrs. ULLMAN & HACKER, for the appellants:

Treating the bill purely as one for an accounting, the same may be maintained. *Blake* v. *Railroad Co.* 56 N. Y. 491; Cook on Stock, sec. 644.

Where the majority of the stockholders are interested in another corporation, and the two corporations have contracts between them, it is fraudulent for that majority to manage the affairs of the first corporation for the benefit of the second. A court of equity will intervene to protect the minority, upon application of the latter. *Menier* v. *Telegraph Works*, L. R. 9 Ch. 350; *Peabody* v. *Flint*, 88 Mass. 52; *Gorham* v. *Gilson*, 28 Cal. 479.

The proposition is so elementary and well settled that we forbear wearying the court with further quotations, but refer to the following cases: *Railroad Co.* v. *Poor*, 59 Me. 277; *Railroad Co.* v. *Dewey*, 14 Mich. 477; *Dwight* v. *Blackman*, 2 Mich. 334; *Michand* v. *Girod*, 4 How. 355; *Railroad Co.* v.

*Elliott,* 57 N. H. 398; *Davoe* v. *Fanning,* 2 Johns. Ch. 268; *Cook* v. *Wool Co.* 43 Wis. 433; *Abbott* v. *Hard Rubber Co.* 33 Barb. 589; *Dodge* v. *Woolsey,* 18 How. 341; *Martin* v. *Wincook,* 12 Ind. 266; *Brewer* v. *Proprietors,* 104 Mass. 378; *Bill* v. *Telegraph Co.* 16 Fed. Rep. 14; *Meeker* v. *Mining Co.* 17 id. 48.

A court of equity may interfere to prevent a corporation and its officers from willfully misapplying the corporate funds, and from waste and misconduct which amounts to a breach of trust. *Hardon* v. *Newton,* 4 Blatch. 379; *Young* v. *Drake,* 8 Hun, 61; 1 Morawetz on Corporations, sec. 242; *Currier* v. *Railroad Co.* 35 Hun, 355; *Heath* v. *Railway Co.* 8 Blatch. 347; *Rogers* v. *Agricultural Works,* 52 Ind. 297; *Kelsey* v. *Sargent,* 40 Hun, 150.

The bill can be maintained under the latter clause of section 25 of the act relating to corporations. That clause, for "good cause shown," authorizes courts of equity to decree a dissolution of corporations.

The act authorizing a court of equity to dissolve a corporation is constitutional. *Ward* v. *Farwell,* 97 Ill. 593; *Mining Co.* v. *Mining Co.* 116 id. 172.

Mr. JOHN S. RUNNELLS, and Mr. WILLIAM BURRY, for the appellees:

The bill is multifarious. Story's Eq. Pl. sec. 271; *Burnett* v. *Lester,* 53 Ill. 331; 1 Daniell's Ch. Pr. 335; *Whiteside Co.* v. *Burchell,* 31 Ill. 68; *Swift* v. *Eckford,* 6 Paige, 28.

No cause is shown for winding up the Pullman Iron and Steel Company. The "good cause shown" in the statute refers to the former provisions of the same section, and that the jurisdiction of chancery is restricted to those causes, is shown by the cases of *Mining Co.* v. *Mining Co.* 116 Ill. 170, *Alling* v. *Wenzel,* 133 id. 264, and *Insurance Co.* v. *Hunt,* 127 id. 274.

A minority of the stockholders can not wind up a corporation against the wishes of the majority. Morawetz on Corpo-

rations, sec. 216; *Durfee* v. *Railroad Co.* 5 Allen, 242; *Dudley* v. *Kentucky High School,* 9 Bush, 518.

Mr. Justice Shope delivered the opinion of the Court:

Without pausing to consider the ground of objection that the bill is multifarious, we are of opinion that the demurrer thereto was, on other grounds, properly sustained, and complainants electing to stand by their bill, it was properly dismissed.

It is insisted that the bill may be maintained upon either of two grounds: First, as a bill to dissolve the corporation, wind up its affairs, and distribute its assets; and second, as a bill for an accounting between this corporation and the Pullman Palace Car Company and other creditors.

In the absence of statutory authority, courts of chancery had no jurisdiction to decree a dissolution of a corporation by declaring a forfeiture of its franchise, either at the suit of an individual or of the State. *Verplanck* v. *Merchants' Ins. Co.* 1 Edw. Ch. 84; *Doyle* v. *Peerless Petroleum Co.* 44 Barb. 239; *Folger* v. *Columbian Ins. Co.* 99 Mass. 274; *Attorney General* v. *Bank of Niagara,* 1 Hopk. 354; *Denike* v. *New York, etc.* 80 N. Y. 605. The mode of enforcing a forfeiture of the charter at common law was by *scire facias* or *quo warranto* in courts of law only, and at the suit, only, of the sovereign. The judgment in such cases, at law, relates solely to the right to exercise the corporate franchise, and operates to extinguish corporate existence. In respect of trade corporations, independently of statutory provision, and notwithstanding the dissolution of the corporation, its assets belong to those who contributed to its capital and for whom it stood as representative in the business in which it was engaged, and are treated in equity as a trust fund, to be administered for the benefit of the *bona fide* holders of stock, subject to the just claims of creditors of the corporation. Morawetz on Corporations, 1032, and cases cited.

The necessity for invoking the aid of a court of equity after judgment of forfeiture at law, that court alone being competent to reach and administer the fund, has led to statutory enactments vesting courts of equity with jurisdiction to decree a dissolution of the corporation and to wind up its affairs, in given cases, at the suit of an individual beneficiary of the fund. The power to confer such jurisdiction by statute, as one of the powers over corporations reserved by the State, has been uniformly recognized, and nowhere more clearly than in this State, (*Ward* v. *Farwell et al.* 97 Ill. 593; *Chicago Mutual Life Indemnity Ass.* v. *Hunt,* 127 id. 257,) and whenever the power of the court of chancery has been properly invoked the jurisdiction has been sustained. *Life Ass. of America* v. *Fassett,* 102 Ill. 315; *Chicago Life Ins. Co.* v. *The Auditor,* 101 id. 82; *Mining Co.* v. *Mining Co.* 116 id. 170, and *cases supra.*

By the 25th section of the statute for the incorporation of companies for pecuniary profit, being the only section applicable here, it is provided: "If any corporation, or its authorized agents, shall do or refrain from doing any act which shall subject it to a forfeiture of its charter or corporate powers, or shall allow any execution or decree of any court of record for the payment of money, after demand made by the officer, to be returned, 'no property found,' or to remain unsatisfied not less than ten days after such demand, or shall dissolve or cease doing business, leaving debts unpaid, suits in equity may be brought against all persons who were stockholders at the time, or in any way liable for the debts of the corporation, by joining the corporation in such suits," etc. And after providing for *pro rata* liability of stockholders upon unpaid subscriptions, etc., and for enforcing the same, proceeds: "And courts of equity shall have full power, on good cause shown, to dissolve or close up the business of any corporation, to appoint a receiver therefor," with authority to wind up its affairs.

It is not pretended that the facts alleged bring the bill within the provisions of the clause of the statute first quoted. It is not alleged, nor are facts set forth showing, that any of the causes exist for which bills in equity are by this statute authorized to be filed. The bill invokes, not the power conferred by the statute, but the general chancery powers of the court. But it is said, in effect, that as the second clause of the statute quoted gives courts of equity power to decree the dissolution of a corporation "on good cause shown," it may exercise that jurisdiction whenever the interests of the stockholders, or any of them, in equity and good conscience demand it. We do not think the statute capable of that construction. It is clear that the purpose of the provision was to enable the court, in all cases in which the jurisdiction of the court was properly invoked under the statute, to afford complete relief. By the first clause a remedy is provided by which the assets of the corporation, in the cases enumerated in the statute, may be applied in payment of its liabilities, and if insufficient therefor, that subscribers for and holders of unpaid stock of the corporation may be compelled to contribute to the payment of any balance of corporate indebtedness after the application of the corporate effects, without first procuring a judgment of forfeiture at law. No judgment forfeiting the charter of the corporation is necessary to authorize the court to afford this relief, but by the later provision the court may, in cases where cause of forfeiture exists, declare the same, and by its decree dissolve the corporation, and through its receiver administer and distribute the corporate estate, thus making the remedy in equity, in such cases, complete. (*St. Louis, etc. Mining Co.* v. *Mining Co.* 116 Ill. 170; *Alling* v. *Wenzel,* 133 id. 264.) As said by this court, in construing this provision of the statute, in *Chicago Mutual Life Ins. Co.* v. *Hunt,* 127 Ill. 274: "Courts of equity are given full power, on good cause shown, as a portion of the relief provided for by that section, to dissolve or close up the business

of the corporation and to appoint a receiver of its effects." We are of opinion that it is only "as a portion of the relief provided for by that section" that the power to dissolve the corporation can be invoked. Moreover, "good cause" for dissolving the corporation would necessarily be a legal cause,—a cause for which the sovereign authority might by law, resume the franchise granted. It can not be presumed that the legislature intended, by the use of the language here employed, to authorize a decree forfeiting the corporate franchise for causes for which the State might not procure judgment of forfeiture at law. The bill is not maintainable upon this ground.

Nor do we think the bill can be maintained upon the second ground. It seems well settled that if the agents of the corporation, in whom the authority to control its affairs is vested, are themselves guilty of wrong against the corporation, either by personal conversion of its funds, or being interested in another corporation or business, fraudulently manage· the affairs of the corporation to its detriment and for the benefit of such other corporation or concern, a court of equity will, upon proper bill filed, interfere, at the suit of a stockholder, to protect his interest in the corporation, without requiring him to first request or demand that the guilty agents proceed, virtually, against themselves. 1 Morawetz on Corporations, sec. 242; *Harden* v. *Newton,* 4 Blatch. 379; *Heath* v. *Erie Ry. Co.* 8 id. 347; *Peabody* v. *Flint,* 88 Mass. 52; *Dodge* v. *Woolsey,* 18 How. 341; *Rogers* v. *LaFayette Agricultural Works,* 52 Ind. 297; *Railroad Co.* v. *Elliott,* 57 N. H. 398.

It is, however, fundamental in the law of corporations, that the majority of its stockholders shall control the policy of the corporation, and regulate and govern the lawful exercise of its franchise and business. (Morawetz on Corporations, 216; *Dudley* v. *Kentucky High Schools,* 9 Bush, 518; *Durfee* v. *Old Colony Railroad Co.* 5 Allen, 242.) Every one purchasing or subscribing for stock in a corporation impliedly agrees that he will be bound by the acts and proceedings done or sanc-

tioned by a majority of the shareholders, or by the agents of the corporation duly chosen by such majority, within the scope of the powers conferred by the charter, and courts of equity will not undertake to control the policy or business methods of a corporation, although it may be seen that a wiser policy might be adopted and the business more success-ful if other methods were pursued. The majority of shares of its stock, or the agents by the holders thereof lawfully chosen, must be permitted to control the business of the corporation in their discretion, when not in violation of its charter or some public law, or corruptly and fraudulently subversive of the rights and interests of the corporation or of a shareholder.

Tested by these rules the bill is wholly insufficient to war-rant the interference of a court of equity at the instance of these shareholders. For aught that appears the manner of conducting the business of the corporation may have been re-sorted to in the utmost good faith, and with an honest purpose to subserve and promote the best interests of the corporation. Nor can it be said, from the facts alleged, that the interests of the stockholders have suffered more by the course pursued than if a different policy had been adopted. It is not shown by the bill what the product of the company amounted to, or that a market could be found for its output at any price. True, it is alleged that if the sales to the Pullman Car Com-pany, had been at the market price, without alleging what either was; the iron company would have realized a much larger profit; but whether it could have been sold upon the market is wholly left to conjecture. It may be, and it often is, undoubtedly, more advantageous to sell the entire output of the business, even at a small profit, rather than depend upon an uncertain general market. Moreover, as it appears, the corporation was organized to manufacture under certain letters patent, which upon trial proved to be valueless, and the business abandoned. The corporation had expended $116,000 on its plant, which, if it was abandoned, would

prove a total loss. Its cash $100,000, derived from sale of stock, had been spent and $16,000 of indebtedness remained. Under these circumstances it may not have been wise, but was perfectly legitimate, for the stockholders, none of whom seem to have dissented, to utilize the plant as far as practicable, by changing the business to the manufacture of bar iron, and sell the same to the best advantage. It may well be questioned, considering the financial condition of the company at the time, whether the policy of supplying a single customer, and obtaining a line of credit thereby which enabled it to operate its works, was not dictated by the soundest business discretion. But whether it was or not, it is clear, but for the course pursued, the concern now shown to be making a surplus over and above its interest and expense account, must have ceased doing business, and its stock, including that of appellants, have become absolutely worthless, unless help could have been had from some other source. No facts or circumstances are so alleged that fraud in the management of the affairs of the corporation can be said to exist. Aside, therefore, from the indefinite and uncertain character of the allegations of the bill, which, we concur with the Appellate Court in saying, rendered the bill obnoxious to demurrer, we are of opinion that no case is shown by the bill, even if intendments could be indulged in its favor, that will authorize an accounting at the suit of the shareholders. For aught that is alleged, the officers and shareholders of the corporation are willing and capable of taking every step, with fidelity to the interest of the stockholders, that is necessary, if any such interest is prejudicially affected or jeopardized.

Finding no error, the judgment of the Appellate Court is affirmed.

*Judgment affirmed.*