# Phinizy, *et al. v.* Anniston City Land Co., *et al.*

### Bill to Dissolve Corporation, and to Distribute Assets.

(Decided February 10, 1916.  Rehearing denied March 30, 1916.
71 South. 469.)

Corporations; Dissolution; Powers of Equity.—Where it appears beyond question that the continuance of a profitable business cannot be had, a court of equity may decree dissolution of the corporation on a petition of a minority of its stockholders, but a court of equity has no power to decree dissolution at the suit of minority stockholders where the corporation still has large assets, although it appeared that the corporation had lost much money, particularly as in the last year its income exceeded its expenses, notwithstanding it was contended that if dissolution was not decreed, the assets would depreciate so that they would be entirely lost.

APPEAL from Calhoun Chancery Court.
Heard before Hon. W. W. WHITESIDE.
Bill by Mary Louise Phinizy and others, minority stockholders of the Anniston City Land Company, against that corporation and others, for a dissolution of the corporation, the appointment of a receiver, and to sequester and distribute the assets of the corporation. From a decree sustaining demurrers to the bill, complainants appeal. Affirmed.

The two treasurer's reports referred to in the opinion are as follows: Year ending April 30, 1913:

| | |
|---|---:|
| Cash and convertible assets, May 1, 1912........................$ | 4,811.53 |
| Anniston Inn rent........................ | 22.17 |
| Land rent ........................ | 1,389.88 |
| House rent ........................ | 8,323.63 |
| Industrial building rent........................ | 999.96 |

[Phinizy, et al. v. Anniston City Land Co., et al.]

| | |
|---|---:|
| Office building rent | 446.75 |
| Interest | 3,411.10 |
| Real estate (sales and notes paid) | 3,480.00 |
| Royalty on sand and stone | 10.60 |
| Bonds sold | 8,230.32 |
| Total | $ 31,125.94 |

## Net Disbursements.

| | |
|---|---:|
| Expenses, salaries, advertising | $ 4,342.28 |
| Insurance | 858.38 |
| Taxes | 8,607.72 |
| Sidewalks and paving | 572.37 |
| Capital stock purchased and canceled | 13,580.00 |
| Others stocks purchased | 1,300.00 |
| Cash and convertible assets, May 1, 1913 | 1,865.19 |
| Total | $ 31,125.94 |

Year ending April 30, 1914:

## Net Receipts.

| | |
|---|---:|
| Cash and convertible assets, May 1, 1913 | $ 1,865.19 |
| Anniston Inn rent | 49.90 |
| Land rent | 2,082.18 |
| House rent | 8,798.57 |
| Industrial building rent | 950.46 |
| Office building rent | 432.86 |
| Interest | 3,269.50 |
| Real estate (sales and note paid) | 10,619.60 |
| Royalty on sand | 5.00 |
| Sold stock Alabama Pipe & Foundry Co. | 1,200.00 |
| Total | $ 29,272.76 |

## Net Disbursements.

| | |
|---|---:|
| Expenses and salaries | $ 4,166.26 |
| Donation to Lynchburg Foundry Company plant | 2,500.00 |
| Chamber of Commerce advertising | 658.50 |

[Phinizy, et al. v. Anniston City Land Co., et al.]

| | |
|---|---:|
| Attorney's fee in tax cases | 425.00 |
| Court costs in tax cases | 184.69 |
| Insurance | 1,342.69 |
| Taxes for current year | 8,099.24 |
| Taxes for previous year, litigated | 466.33 |
| Taxes on inn for 1906 | 510.07 |
| Capital stock retired, 194 shares at $20 | 3,880.00 |
| Standard Foundry Company 8 per cent. preferred stock | 2,500.00 |
| St. Luke Hospital 7 per cent. bonds | 1,500.00 |
| Permanent building improvement | 400.00 |
| Distribution No. 3 previously uncalled for | 10.00 |
| Cash and convertible assets, May 1, 1914 | 2,629.85 |
| Total | $ 29,272.76 |

RUTHERFORD LAPSLEY, and WILLETT & WILLETT, for appellants. BLACKWELL, AGEE & BIBB, for appellees.

SOMERVILLE, J.—The bill of complaint seeks to sequester and distribute the assets of the respondent corporation among its stockholders by the appointment of a receiver and the sale of the assets, and prays also for a dissolution of the corporation.

Stripped of unessential averments, the bill charges, as a basis for this relief, that since its organization in 1887, with a capital stock of $3,000,000 and assets valued at $1,500,000, respondent's assets have been dissipated or consumed by fixed expenses and unwise sales and investments until they are now reduced to a valuation of $300,000; that the value of its shares of capital stock has been correspondingly depressed; that its fixed or necessary operating expenses each year greatly exceed its income; that it has declared only three dividends in 27 years, aggregating $75,000, or about 4 per cent. on the outstanding capital stock; that there is no prospect for an enhancement of its property values, or an increase of its earnings, within the next 25 years; that the corpus of its assets is being steadily consumed by taxes, insurance, salaries, and other expenses, and the yearly depreciation of the buildings without proper repair; that it is a question only of time when its assets will be completely exhausted in this way, and completely lost to the corporation and

its stockholders; and that, in short, it is a failure, and the further prosecution of its business will end in inevitable ruin.

Our decisions are not entirely harmonious in their statement of the conditions under which courts of equity will exercise the extraordinary jurisdiction here invoked.

In the leading case of *Noble v. Gadsden Land Co.*, 133 Ala. 250, 31 South. 856, 91 Am. St. Rep. 27, it was declared that: "Where the corporation is a going concern, it is undoubtedly true that a minority stockholder cannot maintain a bill and have it dissolved or to have its assets distributed."

This limitation finds support in the opinion adopted by the court in *Sullivan v. Central Land Co.*, 173 Ala. 426, 429, 55 South. 612. And a corporation is a "going concern" even though its assets are less than its liabilities, "if it be still prosecuting its line of business, with the prospect and expectation of continuing to do so."—*Corey v. Wadsworth*, 99 Ala. 68, 11 South. 350, 23 L. R. A. 618, 42 Am. St. Rep. 29.

In *Ross v. Am. Banana Co.*, 150 Ala. 268, 43 South. 817, a right to relief was predicated on the fact that the corporation had "failed of the purposes and objects of its creation."

In *Ala. Cent. Ry. Co. v. Stokes*, 157 Ala. 202, 47 South. 336, relief was denied for failure to show "that the corporation has suspended business, or is a derelict, or that it is impossible for it to attain the real objects for which it was formed."

In *Minona Cement Co. v. Reese*, 167 Ala. 485, 52 South. 523, a showing that the corporation was a failure, "and that the business for which it was formed could never be inaugurated or carried on," was held sufficient.

On the other hand, the test laid down by Mr. Beach, which was merely quoted, arguendo, in *Noble v. Gadsden Co., supra,* and in *Central Land Co. v. Sullivan*, 152 Ala. 360, 44 South. 644, 15 Ann. Cas. 420, seems to have been approved in the later case of *Decatur Land Co. v. Robinson*, 184 Ala. 322, 63 South. 522, where relief was granted on that theory. The text referred to is: "Unless it appears beyond question that the continuation of a profitable business cannot be had, the dissolution of a corporation not yet insolvent will not be decreed upon petition of a minority of its shareholders. If, however, it is clear that the business cannot be profitably continued, the petition of a minority for a dissolution will be granted."—Beach on Corp. § 783.

[Phinizy, et al. v. Anniston City Land Co., et al.]

The chief trouble with this test is that its terms require further definition, since even the wisest men may differ as to what is a "profitable" business, and future results that may appear "questionable" to one man may seem "unquestionable" to another.

In his note to *Noble v. Gadsden Land Co.*, 91 Am. St. Rep. 34, Mr. Freeman thus epitomizes the rule as illustrated by the leading cases: "When the question is one of mere discretion in the management of the business or of doubtful event in the undertaking in which the concern has embarked, a remedy cannot be sought in a court of equity. On the other hand, if it plainly appears that the object for which the company was formed *is impossible,* it becomes the duty of the company's agents to put an end to its operations and wind up its affairs; and should they, though supported by a majority of the stockholders, pursue operations which *must eventually be ruinous,* or should the enterprise be *abandoned as impossible* of realization, any shareholder would, upon plain equitable principles, be entitled to the assistance of a court of equity, and a decree should be rendered compelling the directors to wind up the company's business and distribute its assets among those entitled to them." (Italics supplied.)

In this connection, however, Mr. Freeman quotes the following statement by an eminent English chancellor: "A case might occur where the court would be willing to give, under the act, to a minority of shareholders the species of relief that sometimes is given in cases of ordinary partnership where it becomes impossible (I use the word 'impossible' in the strict sense of the term) to carry on the business any longer. It is not necessary now to decide it. * * * But what I am prepared to hold is this: That this court and winding-up process of the court, cannot be used, and ought not to be used, as the means of evoking a judicial decision as to the probable success or nonsuccess of a company as a commercial speculation."—Per Lord Carrns, *in Re Suburban Hotel Co.,* L. R. A. 2 Ch. App. Cas. 737.

Notes collecting numerous cases on this subject will be found in 91 Am. St. Rep. 33; 39 L. R. A. (N. S.) 1032); and 15 Ann. Cas. 422.

The doctrine which justifies the drastic intervention of equity courts in corporate affairs in the mode here sought is grounded on the theory that the valuable rights of minority stockholders

can be rescued, along with those of a recalcitrant majority, from a common ruin. It does not contemplate the infliction of any loss or injury upon the majority stockholders in order that the minority may be benefited. To help the one class by hurting the other would be an indefensible wrong.

It needs no argument to show that this power of intervention, however wholesome and necessary its exercise may sometimes be, is extremely dangerous in its tendencies, and should be exercised only in the plainest cases. It is not enough that the past prosecution of the corporate enterprise or business has been a financial failure, nor is it enough that its future prosecution will probably be devoid of profit, however strong the probability may seem. On the contrary, so long as the corporation is a going concern; so long as it possesses the means and ability to pursue one or more of its primary purposes or lines of business; and so long as the conditions exhibited do not demonstrate to a moral certainty that its continuation must by inevitable necessity result in serious loss in the near future, and in complete ruin sooner or later—a court of equity will not and should not deprive the majority stockholders of their right to carry on their business under their chosen management, however speculative and uncertain its prospects may seem to a disapproving and dissentient minority.

Those who embark in a corporate enterprise as stockholders do so under an implied agreement that the business shall be controlled and directed by a majority of the stockholders, and that it shall endure for the period fixed by the corporate charter or by general law. The case of *Manufacturers' L. & I. Co. v. Cleary*, 121 Ky. 403, 89 S. W. 248, involved a land company with a history very much like that of the respondent in this case, and in its main features the cases are strongly analagous. The observations of O'Rear, J., are worthy of repetition: "While it is true that trading or commercial corporations may be assumed to have organized solely to make money for their stockholders, it does not follow that the enterprise must be abandoned upon the first disappointment, at the complaint of a single stockholder. The fact that the corporators had fixed a definite period of existence is an implication that the venture shall be continued that long, unless the corporation be sooner dissolved in the manner allowed by law. All business is not at once successful, or even success-

ful at all. Yet it may be pursued in the hope of success, which is the mainspring of traffic. It would be unwarrantable, as well as intolerable, under a system of free government, that the courts should interfere to put a stop to all business ventures which within reasonable time had not shown evidence of success or which were not, in the court's opinion, being pursued with proper diligence or wisdom. Whether the corporation's purpose be one impossible of execution, so that it may be terminated at the complaint of any stockholder, is not a matter to be determined by the weight of the evidence. It must be a certainty, as things are deemed to be certain in law."

And in conclusion he said: "Whether the original expectations of the promoters will ever be realized seems to be problematical. Yet it cannot be said with any certainty that they will not be. Just what the future may hold for these properties is that uncertainty which gives value to all things speculated in, in the markets. It would never do, in our opinion, to say that, just because the chance of appellant's realizing its expectations seemed now to be slim, its existence should be prematurely ended and the venture outlawed. No bad faith on the part of the officers or majority stockholders is shown. They are doing with this property, for aught that the record shows, just what many a prudent owner might well do—hold on, without actual evident losses, till a rising market has brought relief from what looked like, at one time, a disastrous investment. The cases and textbooks cited by both litigants all really present these ideas in one form or another."

While it is proper enough to observe the past history of the respondent corporation as indicative to some extent of its future tendencies, it must be remembered that our real inquiry is as to the impossibility of its future success, and not the certainty of its past failure.

The business of a land company is obviously different in important particulars from most other commercial enterprises The primary business of this respondent was and is to buy, hold, improve, lease, and sell real estate. Its other charter powers are subsidiary to and supposedly promotive of its primary business It has pursued this business uninterruptedly since its creation, and has also bought other corporate stocks as investments, and made donations to encourage industrial development near its

properties. It has an active board of directors and an active local manager, and its stockholders hold annual meetings. In short, it is a "going concern" with unincumbered assets worth $300,000 and with no liabilities other than its capital stock. It was organized in 1887 with a capital stock of $3,000,000, and assets worth $1,500,000. It has made at least two disastrous investments— $150,000 in a public inn, and $65,000 in an office building. The inn is now worthless and rents for $20 or $30 a year, while the office building rents for about $450. It has sold off most of its choice and centrally located property, and has bought in numerous parcels of suburban lands, not yet valuable for building lots, and which are not likely to become more valuable for that purpose until the population of Anniston is doubled,—which the pleader estimates as requiring, on the basis of former census reports, a period of about 25 years. The bulk of the proceeds of past sales—about $500,000—has been consumed in fixed charges and operating expenses; although it appears that within the last 20 years the company has bought in and retired $14,000 shares of capital stock, at a cost ranging between $150,000 and $280,000, and has declared and paid three dividends aggregating $75,000. As an illustration of the impending immolation of its remaining assets, the bill exhibits the annual reports of the treasurer for the fiscal years ending April 30, 1913 and 1914, from which it deduces the conclusion and makes the charge that the annual deficit—the excess of expenses over revenues—is $15,000; and hence the final conclusion, upon which alone the equity of the bill must be grounded, that the complete exhaustion of the company's assets and consequent extinction of stock values, is but a question of time and mathematics.

Judged by the force of its general allegations, many of which are, however, mere conclusions, it may be conceded that the bill makes a case for equitable relief within the rule announced and applied in *Decatur Land Co. v. Robinson*, 184 Ala. 322, 63 South. 522. But the bill exhibits facts from which the court must draw its own conclusions.—*Ross v. Am. Banana Co.*, 150 Ala. 268, 43 South. 817.

By a reference to the two treasurer's reports above referred to, and which the reporter will set out in his statement, it will appear that the fixed operating charges and expenses for 1912-13—which include chiefly taxes, insurance, advertising, and sal-

aries—amount to $13,807; and the income receipts, which include rentals, interest, and royalties, amount to $14,000. The corporate assets sold amounted to $11,710, and the investments in outside stocks amounted to $14,830. For the year 1913-14, it will appear that the fixed operating expenses, as above, amounted to $13,607; and the income receipts amount to $15,587. And the corporate assets sold amounted to $13,684, while the investments ($8,280), and the donation to a foundry ($2,500), amounted to $10,780; with cash on hand, $2,629.

The original bill of complaint was filed in the interim between the appearance of these two reports, a comparison of which will refute the allegation of the bill that: "It is altogether probable that expenses for the current year [then 1913-14], on account of increase in taxes and other expenses, will be larger than for previous years"—expenses actually decreased by $200.

Such a comparison also discounts the contention, which permeates the bill, that the company's rental income is dwindling from year to year. Rents actually increased by $1,132.

Just here, another feature of these exhibits is worthy of comment. The bill shows that the total assets of the company do not exceed $300,000, and yet annual taxes exceed $8,000. Assuming, as we must, that the aggregate of all tax levies does not exceed 2 per cent. in Calhoun county, and calculating on the statutory basis of 60 per cent. of cash value, lawful taxes cannot exceed $3,600. It appears therefore that $4,400 is being annually lost by misappropriation to inflated assessments. Obviously, then, the fixed and necessary operating expenses, as shown by the last report, must be reduced by $4,400; and, when this is done, the company will have a net income, above necessary operating expenses, of about $6,300.

In making these comparisons, and deducing these results, we have, of course, ignored and excluded those expenditures of money which are not reasonably necessary to the operation of the company's business, and which are based on the policy and discretion of its managing officers. If by gross negligence or incompetency they are wasting the funds received by the company, complainant's have other and less drastic remedies to which they must resort.

We do not overlook the charge that the buildings on respondent's property have not been kept in reasonable repair, and are

constantly deteriorating in value, for which a "fair allowance should not be less than $10,000 annually." This is not a charge that the buildings are actually reduced in value by $10,000 each year, nor does the bill show what all the buildings are worth proportionately to the entire property, nor how much of the supposed deterioration is taking place in buildings other than the inn and office buildings—the complete loss of which particular buildings would clearly be of immense benefit to respondent by the saving of taxes and insurance. But conceding that such a charge might be definitely made, it represents a process of depletion which is too indefinite and too gradual, and whose consequences are too remote, under the conditions shown, to justify the present dismemberment of the corporation by the violent and sacrificial process of judicial sale. It must be noted, also, that the conclusion is refuted by a comparison of the rental returns for the years 1912-13 and 1913-14, for actual results are more persuasive than the wisest prognostications.

So far as the general future of respondent's real property is concerned, we do not think that human wisdom or foresight can affirm with any sort of certainty that it is without such prospects of enhancement as would warrant a further continuation of the life and business of the company—in view of its present condition, and the character of its unincumbered holdings. Its future success or failure is a simple speculation, just as it was 25 years ago, and we cannot justify the substitution of our judgment on that question for the judgment of its directors and majority stockholders, by a judicial affirmance of the impossibility of a comparatively profitable issue of this business —especially if it be conducted with prudence and reasonable economy.

The facts and conditions exhibited by the bill deprive it of its essential equity, and the decree of the chancery court sustaining the demurrers will be affirmed.

Affirmed.

ANDERSON, C. J., and MAYFIELD and THOMAS, JJ., concur.