(80 South. 872)

DIXIE LUMBER CO. et al. v. HELLAMS.
(1 Div. 42.)

(Supreme Court of Alabama. Feb. 13, 1919.)

1. CORPORATIONS ⊜614(7) — DISSOLUTION —SUIT BY MINORITY STOCKHOLDER.

In a suit by a minority stockholder for dissolution of the corporation and distribution of assets, the rights of the parties to the bill are to be determined as of the date of the filing with reference to the condition of the corporation and the question of its being a going concern.

2. CORPORATIONS ⊜603 — DISSOLUTION — GROUNDS—LOSSES.

Equity may not dissolve a corporation at the instance of a minority stockholder upon the mere showing that the corporate business is losing, where it is a going concern with means and ability to pursue its primary business, and it is not demonstrated to a moral certainty that its continuance must necessarily result in serious loss in the near future, or complete ruin sooner or later.

3. CORPORATIONS ⊜614(5) — DISSOLUTION —EVIDENCE.

In a suit by minority stockholder for dissolution of a corporation, evidence held insufficient to require an equity court to decree a dissolution and distribution of assets among stockholders.

Appeal from Circuit Court, Mobile County; Claude A. Grayson, Judge.

Suit by Lidia E. Hellams against the Dixie Lumber Company and others. Judgment for plaintiff, and defendants appeal. Reversed and rendered.

D. B. Cobbs, of Mobile, for appellants.
Jesse F. Hogan, of Mobile, for appellee.

GARDNER, J. This suit was brought by appellee, a minority stockholder in the Dixie Lumber Company—a domestic corporation— to dissolve said corporation and sequester and distribute its assets among its stockholders, and for the appointment of a receiver to this end. The corporation and all of its stockholders were made parties to the suit.

The ownership of stock in the corporation was one of the contested issues in the cause —to which much argument has been addressed. But the conclusion which we have here reached renders a consideration of that question unnecessary, as, assuming (without deciding) that complainant is still the owner of 25 shares of said corporate stock, we are of the opinion that a case for dissolution has not been made out. We will therefore treat only briefly this latter question.

The corporation was organized in 1904, with an authorized capital stock of $15,000, divided into 150 shares of the par value of $100, and was authorized to begin its business upon the subscription of $7,500 of said capital stock. There were three incorporators, who paid in cash $1,500, and conveyed some real estate valued at $3,000, thus constituting the $7,500 payment for one-half of the authorized stock. The corporation was organized for the purpose, among other things, of manufacturing, buying and selling lumber, and its products, * * * contracting and building houses, * * * manufacturing and dealing in all kinds of building materials." A planing mill was erected in the city of Mobile, and business was begun with the above-stated sum as its capi-

tal. The first two years of operation proved successful, resulting in a profit of about $8,000, and the directors authorized a stock dividend of $7,500, which was issued to the original incorporators, and they were receipted by the treasurer for the balance of their subscription. It is in this manner that the full capital stock was paid.

The ownership of this stock in the course of time passed from the hands of the original incorporators, and, in 1908, J. C. Mackinnon purchased some of the stock and became a director, as well as secretary and treasurer of the corporation. Later 50 additional shares of stock were purchased by the wife of said Mackinnon, who now admittedly owns or controls two-thirds of the stock of the corporation. There had been regular meetings of the stockholders and directors of the corporation, and the business had been in constant operation until May 1, 1915, when the. planing mill, including the office and machinery, were destroyed by fire. No dividends have been paid since the stock dividend of 1906. At the time of the fire, respondent J. C. Mackinnon had charge of the operation of the business, and continued to look after its affairs after the fire—collecting the insurance, having the lumber which remained upon the yards sold, and an employé living near the mill to keep a watch upon the same. The testimony of said Mackinnon discloses that at this time there was much depression in the lumber business in Mobile, such as not to justify the rebuilding of the plant at that time; that it was necessary to seek another market, which existed in the north and west; and that he had made arrangements with the Mobile bank (with which he had been doing business) to secure a large line of credit for a profitable business in handling lumber in carload lots, and to that end had established a branch office in Chicago, and was engaged in working up this business when, on July 15, 1915, this action to dissolve the company was brought, the effect of which made it impossible to obtain credit and practically suspended the business for the time being. It further appears that at the time of the filing of the bill all the debts of the corporation had been paid, and it had some cash on hand; its assets, including the real estate, being of the estimated value of from $6,000 to $8,000.

The complainant in support of her suit relies very largely upon the fact that for several years no dividend had been paid, and that an examination of the books which were preserved from the fire, as made by expert accountants, disclosed that under the management of said Mackinnon the business has lost money, and therefore, as he is a poor manager, inevitable ruin to the corporation and loss to the stockholders must result. There seems to be some suggestion of negligence or want of due care on the part of Mackinnon, in the preservation of the property; but this does not seem to be well sustained by the proof. Said Mackinnon is shown to have given his entire time to the business, and, of course, was largely interested in its success. There is no suggestion of abuse of his authority by virtue of his control of the majority stock to defraud the minority stockholders, or that there has been any misappropriation of the corporate funds.

The evidence is quite voluminous, and we do not consider that a detailed discussion of the same would serve any useful purpose.

During the first year or two of respondent Mackinnon's association with the company in an official capacity, there appears, we think, a lack of harmony, and, indeed, some friction, existing between him and other parties interested, including complainant's husband, as to the conduct of the business, which probably had some deterring effect upon the company. But since 1910, at least, it appears that said Mackinnon has had exclusive management of the company's affairs, and that the business has been operated at a loss for each of these years, with the exception, it seems, of the year 1912, in which year the books disclose a substantial profit. The company's books show a considerable surplus at the end of each year, that of January 1, 1915, being $6,725.52; and the losses in operation seem to have been charged against the surplus account. While the testimony of expert accountants discloses such losses, yet it is difficult from the testimony to determine the actual loss sustained by the company. We are inclined to the view, however, that the actual loss was not as great as that thus disclosed. We think it very reasonably appears that some of the assets were carried on the books of the company at entirely too high a figure, as had been the custom in the mode of bookkeeping since the time of its organization, and after the fire there was a reduction of valuation on the books.

The testimony of respondent Mackinnon, which, as to this point, does not appear to be seriously controverted, shows, by way of explanation of the losses, that during this period of time there had been much depression in the lumber business in the Mobile vicinity, and that this was felt by all those engaged in the planing mill business, and, indeed, required some of them to temporarily suspend operation, and further that the price of lumber had risen higher and required more capital in the operation of the business; that during this period of depression the banks were unwilling to grant liberal accommodations as had been the previous custom. His testimony further disclosed that the corporation had dealt in carload orders of lumber before the fire at a profit, and that lumber yard people in Mobile were also

looking for carload business to the North. And, as previously stated, he had made arrangements to that end with his bank at the time of the filing of this suit. That such arrangement had been made for the carrying on of business in carload lots, and that other lumber concerns were also looking to the north for such business, is not disputed.

[1] Some argument is advanced that this venture has proved unsuccessful; but it is to be remembered that it had just begun, and the arrangement had just been completed at the time of the filing of the bill, and that the rights of the parties under the bill are to be determined as of the date of its filing. Sullivan v. Central Land Co., 173 Ala. 426, 55 South. 612.

It therefore appears from this very general outline of the case that, at the time the bill was filed, the respondent corporation was what is termed a "going concern," with no debts and assets of the value of between $6,000 and $8,000, and that for several years it had been operated at a loss.

[2] From the recent case of Phinizy v. Anniston City Land Co., 195 Ala. 656, 71 South. 469, wherein many of our decisions touching the question here involved as to the dissolution of a corporation by a minority stockholder are cited, we take the following excerpt:

"It needs no argument to show that this power of intervention, however wholesome and necessary its exercise may sometimes be, is extremely dangerous in its tendencies, and should be exercised only in the plainest cases. It is not enough that the past prosecution of the corporate enterprise or business has been a financial failure, nor is it enough that its future prosecution will probably be devoid of profit, however strong the probability may seem. On the contrary, so long as the corporation is a going concern; so long as it possesses the means and ability to pursue one or more of its primary purposes or lines of business; and so long as the conditions exhibited do not demonstrate to a moral certainty that its continuation must by inevitable necessity result in serious loss in the near future, and in complete ruin sooner or later—a court of equity will not and should not deprive the majority stockholders of their right to carry on their business under their chosen management, however speculative and uncertain its prospects may seem to a disapproving and dissentient minority."

We are of the opinion that the very statement of the above-quoted rule, when applied to the facts of the instant case, suffices to demonstrate that the complainant has failed to establish such a situation by the proof as would justify the sequestration and distribution of the assets of the corporation among the stockholders, and also its dissolution. So far as the evidence appears, the corporation was not only a "going concern," but at the time of the filing of the bill it possessed the means and ability to pursue one of its primary purposes or lines of business, and clearly it cannot be said that it has been demonstrated to a moral certainty that its continuation must necessarily result in serious loss in the near future, and in complete ruin sooner or later.

It is, of course, not contended that the lumber business itself cannot be made successful or profitable; but the insistence seems to be that, from the losses sustained in the operation of the business, the respondent Mackinnon, who has sole charge of the corporation's affairs, is not a competent manager. Aside from the explanation made by said Mackinnon as to the period of depression in the lumber business, the following quotation from the last-cited authority would, it seems, be sufficient answer to this insistence:

"If by gross negligence or incompetency they are wasting the funds received by the company, complainants have other and less drastic remedies to which they may resort."

But we indulge in no further discussion. [3] The evidence has been most carefully examined and re-examined, and, after a careful consideration thereof in connection with the rule of law laid down by this court governing cases of this character, we have reached the conclusion that the complainant has failed to make out her case for a dissolution, and that her bill should be dismissed. This is not in accord with the conclusion reached by the court below, and it results that the decree will be reversed and one here rendered dismissing the bill.

Reversed and rendered.

All the Justices concur.