(No. 34166.—

CENTRAL STANDARD LIFE INSURANCE COMPANY, Appellant, *vs.* C. HAYDEN DAVIS *et al.,* Appellees.

*Opinion filed March 20, 1957.*

VERNON R. LOUCKS, of Chicago, and H. E. FULLEN-WIDER, of Springfield, (CHARLES O. LOUCKS, JAMES L. HENRY, and CLARKSON W. LOUCKS, of counsel,) for appellant.

BARBER & BARBER, of Springfield, and E. K. BEKMAN, of Ottumwa, Iowa, (CLAYTON J. BARBER, and ALTON G. HALL, of counsel,) for appellees C. Hayden Davis *et al.;* GIFFIN, WINNING, LINDNER & NEWKIRK, of Springfield, (MONTGOMERY S. WINNING, of counsel,) for appellee Abraham Lincoln Hotel Company.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

Central Standard Life Insurance Company owns 4098 shares of the preferred stock of Abraham Lincoln Hotel Company. On its own behalf, and on behalf of approximately four·hundred other preferred shareholders, it brought this class action in the circuit court of Sangamon County, praying for the dissolution of the Hotel Company and a sale and distribution of its assets. After a trial be-

fore a master, the circuit court dismissed the complaint for want of equity. Plaintiff's direct appeal was transferred to the Appellate Court, because this court lacked jurisdiction. (7 Ill.2d. 266.) The Appellate Court affirmed the decree of the trial court, (10 Ill. App.2d 245,) and we granted leave to appeal.

Something of the history of the corporate venture is essential to an understanding of the contentions of the parties. The Hotel Company was organized on May 1, 1924. Its original capitalization consisted of 8000 shares of no par value common stock, issued at $5 per share, and 7250 shares of $7\frac{1}{2}$ per cent cumulative preferred stock having a par value of $100 per share, issued at par. The corporation acquired a hotel site in Springfield and constructed a hotel. To do so it borrowed $700,000 at six per cent, secured by a mortgage. In 1935 the maturity of the mortgage was extended in proceedings under section 77B of the Bankruptcy Act. In 1944 the principal balance of the mortgage, $350,000, was refinanced with a fifteen-year refunding mortgage bearing interest at four and one-half per cent.

From the outset the hotel has been operated by the Abraham Lincoln Hotel Operating Company, under leases from the Hotel Company. When the mortgage was refinanced in 1944, a new lease was entered into between the Hotel Company and the Operating Company. That lease is the Hotel Company's only source of income. It provides that the lessee shall pay all taxes, ground rent, insurance, interest on the mortgage and "principal payments not in excess of $15,000 per year" and all costs necessary to put and keep the building and its equipment and furnishings in good condition as a first class hotel. After paying these and other expenses, except depreciation and Federal income taxes, the Operating Company is to pay annually one half of all profits to the Hotel Company.

The defendants are C. Hayden Davis, who owned 7990

shares of the common stock of the Hotel Company when this action was commenced, and F. M. Condit and E. E. Nicholson, each of whom owned 5 shares. When this action was commenced, Davis owned or controlled 4051 shares (a very substantial majority) of the common stock of the Operating Company, and 418 shares of its preferred stock. While the case was pending all of these shares were sold by Davis to Charles H. Mitchell. The Hotel Company and the Operating Company were also original defendants, and Mitchell was allowed to intervene as a defendant.

Dividends were paid on the preferred stock from 1924 to 1931, but no dividends have been paid since 1931. As of October 2, 1952, when the complaint was filed, cumulated dividends amounted to $1,051,800. The plaintiff points out that this amount would have to be paid before any dividends could be paid on the common stock, and that this amount, plus the par value of the outstanding preferred ($701,200), would have to be paid to the preferred shareholders on liquidation, before anything could be paid to the holders of the common stock. The complaint alleges that the operating history of the company shows that it will never make a profit sufficient to meet the accrued dividends on the preferred stock; that the individual defendants therefore have no interest in the continuance of the company except that which results improperly from their exclusive control and management of it; that the assets of the company are presently worth substantially less than $1,753,000 and are depreciating, and that under these circumstances the conduct of the defendants in refusing to liquidate the company is oppressive.

The various defendants admitted that $1,753,000 was the sum to which the preferred shareholders would be entitled on liquidation, as of the date the complaint was filed, but denied the other significant allegations. They alleged that the assets of the company are presently worth more than two million dollars, and they set forth a separate

defense of estoppel and *laches*. The separate defense alleges that in 1944, when the new lease between the Hotel Company and the Operating Company was entered into, E. H. Henning, now the president of plaintiff company, was a director of the Hotel Company and president of Illinois Bankers Assurance Company which then owned the preferred stock now owned by the plaintiff; that E. H. Henning as director of the Hotel Company moved to adopt the resolution authorizing the lease, and as president of the Illinois Bankers Assurance Company voted the stock now owned by the plaintiff in favor of the resolution. Defendants allege that in reliance on that action and as controlling shareholders of the Operating Company, they produced and applied large sums of money in retiring the mortgage indebtedness of the Hotel Company and made extensive renewals and improvements upon the building and that plaintiff's predecessor in title to the stock, the Illinois Bankers Assurance Company, and plaintiff, which acquired the stock in October, 1951, at all times acquiesced in their conduct until the resignation of E. H. Henning from the board of directors of the Hotel Company in April, 1952. They assert that plaintiff is thereby estopped from maintaining this action. Plaintiff admits these facts but argues that they do not work an estoppel.

The evidence as to the present value of the Hotel Company's assets was conflicting. On behalf of plaintiff, Edwin A. Boss, who has bought and operates thirty-two similar hotels, testified that in his opinion the assets of the Hotel Company, excluding the furnishings which are owned by the Operating Company, were worth $700,000. Defendants introduced an appraisal obtained for insurance purposes that fixed the reproduction value, less depreciation, of the hotel building at $2,150,273.77. To this figure they add $218,733.49, the amount at which the ground is valued on the books, to arrive at a total value of $2,369,007.26.

As another indication of value, plaintiffs point to a contract entered into in April of 1954, after this suit was instituted, by which C. Hayden Davis sold all his stock interests in both companies to Charles H. Mitchell for $1,500,000. The contract provided for a contemporaneous payment of $105,000, and a payment of $25,000 by August 1, 1955. It further provided for payments of $5000 a month, which increased to $7000 per month in the last 15 years of the contract. The balance of the purchase price was payable May 1, 1979. The contract provided that on default by the purchaser all payments theretofore made to the seller should be retained as liquidated damages, and that neither party should have any further liability to the other by reason of the contract. There was testimony that all payments falling due under the contract prior to June 30, 1954, had been made in accordance with its terms.

The master regarded the evidence as to the earnings and value of the two companies "immaterial and irrelevant to the issues in this case," and he held that in the absence of any evidence that the plaintiff, or its predecessor in title, ever dissented in a stockholders or board of directors meeting to action then taken, the actions of the defendants have not been illegal, oppressive or fraudulent. His recommendation that the cause be dismissed for want of equity was adopted by the chancellor.

The Appellate Court affirmed on a different ground. While that court spoke of "clear abuse of trust" as being sufficient to establish oppressive conduct within the meaning of section 86 of the Business Corporation Act and cited definitions of the term "oppressive" as "unreasonably burdensome; unjustly severe. Tyrannical. Overpowering to spirit or senses," and while it recognized that the word "oppressive" in the section must be read separately from "illegal" and "fraudulent," it held that the evidence did not establish oppressive acts on the part of defendants ap-

parently because there had been no showing of "misman-agement, or misapplication of assets." The court did not reach the question of estoppel.

This court has held that the authority of courts of equity to decree the dissolution of a corporation is statutory. (*Wheeler* v. *Pullman Iron and Steel Co.* 143 Ill. 197.) Section 86 of the Business Corporation Act of 1933 pro-vides that courts of equity shall have full power to liquidate the assets and business of a corporation in an action by a shareholder when it is made to appear "[t]hat the acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent." Ill. Rev. Stat. 1955, chap. 32, par. 157.86.

The plaintiff does not contend that there has been any illegal or fraudulent conduct. It does not charge that the 1944 lease was improper or unfair, and it admits that the operation of the hotel has been as efficient as could reasonably be expected. Its complaint rests squarely on the ground that the conduct of the individual defendants in refusing to liquidate the Hotel Company is "oppressive" within the meaning of section 86. Its position is that suffi-cient time has elapsed to demonstrate conclusively that the venture cannot succeed, and that only the holders of the com-mon stock can profit from its continuance, and it contends that the corporation should therefore be liquidated so that the preferred stockholders may now salvage what they can of their investment without being compelled to await the expiration of the corporation's 99-year charter.

The concept of oppressive conduct as a ground for dissolution of a corporation in equity appears for the first time in the 1933 act. The able briefs of counsel have not referred us to any authoritative determination of its pre-cise scope. *Tower Hill Connellsville Coke Co.* v. *Piedmont Coal Co., Inc.,* 64 F.2d 817, relied upon by the plaintiff, is a case in which liquidation of a corporation was ordered in an action brought by preferred shareholders. What is

there said as to the degree of good faith required in transactions between corporations that have interlocking directorates and as to the powers of courts of equity to enter decrees of dissolution in appropriate cases is instructive and persuasive. But that case clearly turned on the fraudulent conduct of the principal common shareholder in using corporate assets that should have been applied to the payment of dividends on the preferred stock to finance speculations that could not benefit the preferred shareholders but might be advantageous to the owners of the common stock. The fraudulent aspects that colored that case are not present in the allegations and the proof now before us. In *Perlman* v. *Feldman*, 219 F.2d 173, the controlling stockholder arrogated to himself an advantage or opportunity that rightfully belonged to the corporation. That element, too, is absent on this record.

Defendants urge upon us certain cases from other jurisdictions which held that in the absence of fraud or gross mismanagement, dissolution will not be granted at the instance of minority shareholders unless it is demonstrated to a certainty that continuation of the business must inevitably result in serious loss in the near future. (See, *e.g.*, *Phinizy* v. *Anniston City Land Co.* 195 Ala. 687, 71 So. 469, 471; *Dixie Lumber Co.* v. *Hellams*, 202 Ala. 488, 80 So. 872, 874; *James F. Powers Foundry Co.* v. *Miller*, 166 Md. 590, 171 Atl. 842, 845; *Manufacturer's Land & Improvement Co.* v. *Cleary*, 121 Ky. 403, 89 S.W. 248.) But those cases were not concerned with the interpretation of statutes like ours. The word "oppressive" does not carry an essential inference of imminent disaster; it can, we think, contemplate a continuing course of conduct.

Plaintiff argues that the word "oppressive" does not necessarily savor of fraud, and that the absence of "mismanagement, or misapplication of assets" does not prevent a finding that the conduct of the defendants has been oppressive. We agree with that interpretation, and we reject

defendants' argument that the word is substantially synonymous with "illegal" and "fraudulent." Misapplication of assets or mismanagement of funds are not, as we read the statute, indispensable ingredients of "oppressive" conduct. (See a recent interpretation of that word as it appears in section 210, Companies Act, 1948, 11 & 12 Geo. 6 C. 38, by the Scottish Court of Sessions, *Elder* v. *Elder & Watson*, 1952, S.C. 49, 55.) L.C.B. Gower, Modern Company Law (London, Stevens & Sons, Ltd. 1954) p. 511-515.

Neither the trial court nor the Appellate Court made any finding as to the value of the Hotel Company's assets. The evidence on that question is conflicting and not entirely satisfactory. The witness who testified on behalf of the plaintiff had a broad experience in the purchase and operation of similar hotel property, but the weight of his estimate of value is somewhat lessened by the fact that it was made on a rule of thumb basis that a smart purchaser would pay only seven times the gross income from the property, minus certain specific charges. On the other hand, we do not regard the brick and mortar valuation of the insurance appraisal offered by the defendant as of great significance in determining the market value of the hotel property. In deciding what the property would bring on the market it does not help much to know what might be paid by an insurance company on the remote contingency of its total destruction.

Nor is the figure at which Davis sold his stock interest to Mitchell significant. That transaction was a contract to sell which the buyer could abandon without any continuing obligation whenever it became advisable to do so. Moreover, the fact that a supplement to that contract specifically fixed a separate valuation of $1,400,000 for the common stock of the Hotel Company suggests an abnormal correlation between the purchase contract and the pending litigation. We approach the case, therefore, on the assumption that if the Hotel Company was liquidated the common

shareholders would probably receive nothing. The fact that no dividend has been paid on either preferred or common stock for more than 25 years supports that assumption.

More significant, in our opinion, than the conflicting evidence on the question of the value of the Hotel Company's assets is the fact that the record suggests that the company may shortly be in a position to pay dividends on the preferred stock. The mortgage debt has been consistently reduced. At the time the case was argued the outstanding balance was $119,000.

Major improvements have been made, including the installation of some air conditioning, new elevators and remodeling of the first and second floors. During the period 1942-1953 an average of $25,000 per year, at a minimum, went into payments on the mortgage debt and improvements to the Hotel Company's property. The gross income from the hotel business increased from approximately $400,000 in 1942 to over $1,000,000 in 1951. It is true that expenses have also increased, but we are not satisfied that a company that has increased its business to this extent and has also been retiring its debt at a rapid rate will not shortly be in a position to pay some substantial part of the annual dividend of $52,590 to which the preferred stockholders are entitled. The record also indicates the possibility of an operating arrangement more favorable to the Hotel Company than is the present lease. There was testimony to the effect that operating profits could be increased. And the terms of the contract by which Davis's interests were sold to Mitchell of themselves strongly suggest that there is a substantial margin that might be made available to the Hotel Company under the provisions of a more favorable operating contract. The present lease expires on August 1, 1959. A two-thirds vote of all shareholders, preferred as well as common, is necessary to renew it. Ill. Rev. Stat. 1955, chap. 32, par. 157.72.

Thus instead of the imminent danger of serious loss,

which in the absence of a statute like ours has sometimes been regarded as requisite to a decree of dissolution in cases of this kind, there is actually a prospect of gain. Corporate dissolution is a drastic remedy, and the teachings of generations of chancellors admonish us that it must not be lightly invoked. We hold, therefore, that the present record does not establish plaintiff's right to the relief it seeks.

Moreover, as section 86 of the Business Corporation Act indicates, proceedings under that section are in equity. Here, as in other proceedings in equity, a plaintiff must satisfy the court as to his standing to sue. Plaintiff's standing rests on its admitted legal right to the greater part of a sum now in excess of $1,753,000, representing the par value of the outstanding preferred stock and accrued dividends. Plaintiff acquired its stock in October of 1951 from the Illinois Bankers Life Assurance Company. The only indication as to the cost of this stock to plaintiff is that in 1948 the Illinois Bankers Life Assurance Company listed it with the Department of Insurance at an "admitted value" of $62.50 per share; the Director of the Department, however, required that this valuation be supported by a special cash contingency reserve of $200,000. We think that if a plaintiff is to be entitled to the drastic relief here sought, it is incumbent upon him to show that he is himself oppressed. A plaintiff cannot complain of the continuation of a venture which, though solvent, is not profitable, when he fails to show that he has not already taken advantage of the situation he complains of in the price that he paid for his stock. Equity will not award the drastic relief here sought in order to aid a plaintiff in what might be a profitable speculation. (See *Wall & Beaver Street Corp.* v. *Munson Line,* 58 F. Supp. 109, 116.) A stockholder who brings a class action on behalf of himself and others must show that he is himself entitled to relief. *Babcock* v. *Farwell,* 245 Ill. 14.

While we thus hold that the trial court properly dis-

missed the present action, it does not follow that the preferred shareholders must await the termination of the life of the corporation before distribution of its assets can be decreed. From the outset this venture was financed by money of the mortgage bondholders and that of the preferred stockholders. The common stock was but a small fraction of the original investment. Time may show that there is no reasonable prospect of profitable operation. The present record does not.

In the view we have taken of the case, it has not been necessary to pass on the question of estoppel. The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*