(No. 14360.—Decree affirmed.)

JOHN S. ABBOTT *et al.* Defendants in Error, *vs.* WILLIAM E. LOVING *et al.* Plaintiffs in Error.

*Opinion filed April 19, 1922—Rehearing denied June 7, 1922.*

1. PLEADING—*when a bill is not multifarious.* Where the causes set forth in a bill may more conveniently be tried in a single suit, so that a multiplicity of suits will be avoided, and where the relief sought in each cause is of the same general character and no unreasonable hardship will be caused the defendants, the bill is not multifarious.

2. CORPORATIONS—*when bill to set aside organization of corporation for fraud is not multifarious.* A bill filed by subscribers to the capital stock of a corporation to set aside the organization on the ground of fraud is not multifarious because it prays for the setting aside of certain deeds conveying property to one of the defendants as trustee for the corporation, that the subscription of the complainants be considered null and void, and that the charter of the company be set aside, where all the instruments against which the relief is prayed are the result of a common scheme to defraud the complainants.

3. SAME—*fraudulent issue of unpaid stock as fully paid up is cause for forfeiture.* The issuing of stock by a corporation fraudulently as fully paid up, when, in fact, it is not actually paid, renders the charter of the corporation liable to forfeiture at the instance of the State.

4. SAME—*court of equity has statutory power to dissolve corporation because of fraud in organization—receivers.* Under section 54 of the general Corporation act of 1919 a corporation may be dissolved by a bill in chancery filed by stockholders or subscribers for stock on the ground of fraud in the organization of the corporation, and where there is no indebtedness to third parties which is not involved in the fraud connected with the company's organization the decree for dissolution will not be reversed merely because it does not provide for a receiver.

THOMPSON, C. J., dissenting.

WRIT OF ERROR to the Circuit Court of Crawford county; the Hon. JULIUS C. KERN, Judge, presiding.

DONOVAN D. McCARTY, and JONES & LEVIN, for plaintiffs in error.

BRADBURY, GAINES & BRADBURY, and A. L. LOWE, for defendants in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a proceeding in which an original bill in chancery was filed in November, 1920, and later an amended bill was filed by defendants in error in the circuit court of Crawford county concerning the organization and conduct of a poultry, feeding and produce business under the corporate name of the Crawford Produce Company, in and about the city of Robinson, in said county. On a hearing in the circuit court it was found there was fraud in the organization of the produce company, and a decree was entered that certain deeds conveying property to plaintiff in error William E. Loving as trustee should be set aside and that a subscription paper obtained by Loving for shares of stock be considered null and void, and also that the organization of the produce company, and its charter, should be set aside because of fraud in the organization. A writ of error has been sued out to review that decree.

According to the allegations of the amended bill, which the evidence in the record tends to support, it appears that plaintiff in error William E. Loving undertook to interest people in Crawford county, particularly in Robinson, in the organization of a produce company to be located in that city, to engage in the poultry business and for the building and carrying on of a modern poultry, feeding and produce plant therein; that after talking with several people interested in the project he invited them to visit Olney, where

he had a plant located, to examine the workings of that
plant and to satisfy themselves that the plan of such a
plant in Robinson was practical and advantageous; that
certain of those who afterwards subscribed to the project
went with him to visit the plant at Olney, and as the re-
sult of this visit Loving was invited by the Chamber of
Commerce of Robinson to present his views on the subject
before its members, and he appeared before the organization
and presented his plans in a rough outline, which appear to
have been favorably received by his hearers. He then un-
dertook to obtain stock subscriptions from the citizens of
Robinson and the adjoining portions of Crawford county,
with the understanding that a corporation was to be or-
ganized with a capital stock of $60,000, $30,000 of which
was to be subscribed by the citizens of Robinson and vicin-
ity and $30,000 to be furnished by Loving and his father,
A. R. Loving. The weight of the evidence in the record,
in our judgment, tends to support the allegations of the
bill that it was understood when the stock subscriptions
were taken by Loving that after the stock was subscribed
the corporation was to be organized with a board of di-
rectors whose names were specified, four of whom were
well known business or professional men of the county and
the fifth member to be the elder Loving. The subscription
paper which was circulated by Loving provided for 1000
shares of preferred stock at $100 per share and 1000 shares
of common stock at no par value but to be sold at $5 per
share, and that each subscriber was to receive half a share
of the common stock for each $100 share of preferred
stock. After a certain number of subscribers were obtained
a charter was issued by the Secretary of State upon Loving
filing the usual statement showing that all the stock had
been subscribed, and in this statement A. R. Loving, Iley
Smith, Athas Greeson, R. R. Erving and G. C. Barker
were named as directors, and these names were given in

the statement attached to the charter issued by the Secretary of State. All of the five named persons were friends or relatives of Loving and in no way selected by or satisfactory to the subscribers to the stock but were selected by Loving as being friendly to himself. The signers of the statement sent to the Secretary of State, upon which the charter was issued, were William E. Loving, Athas Greeson, his brother-in-law, and Robert R. Erving, of Chicago. It is insisted by counsel for plaintiffs in error that these men were named on a "statement of incorporation" that was referred to in the stock subscription paper as attached thereto, but the testimony of a number of witnesses on the part of defendants in error is to the effect that no such statement with the directors' names on it was attached to the subscription paper, and the persons who were, in fact, named as the first board of directors in the statement sent to the Secretary of State were not, except A. R. Loving, referred to as the proposed directors at the time the subscription paper was signed. It also appears that about the time they applied for the charter Loving procured a deed from the Robinson Ice and Milling Company to himself, as trustee for the Crawford Produce Company, conveying the real estate and assets of the ice company for the expressed consideration of $24,200, to be paid in capital stock of the proposed corporation to the stockholders of the ice company in proportion to their respective shares. Said deed was afterwards recorded in the recorder's office of Crawford county. The bill also alleges that Loving secured other deeds to the real estate for the proposed site of the corporation from Edward E. Lindsay and wife, D. A. Mefford and wife, F. W. Lewis and wife, and others, to be paid for in capital stock of the proposed corporation, and that after the selection of the first board of directors, because of this transaction with the ice company, it was decided to increase the capital stock for which the Crawford Produce Company was incorporated from $60,000 to $100,000.

The bill further alleges that William E. Loving caused the persons designated as directors of the produce company, after their selection, to hold a meeting with intent to cheat and defraud defendants in error, and said board passed a resolution to take over the property and assets of the ice company at $24,200, the poultry and egg business of A. R. Loving & Co., located at Robinson and Greenup, at a valuation of $14,700, and other property for the poultry and egg business at $2760, all of said property to be paid for in stock of the Crawford Produce Company corporation; that Loving subscribed for himself and A. R. Loving, jointly, 530 shares of the common stock and 115 shares of the preferred stock of the Crawford Produce Company, which was represented in the statement of the incorporation filed with the Secretary of State to have been fully paid but which was not, in fact, fully paid, and thereupon, after procuring the approval of the directors of the company, Loving, as trustee, executed deeds conveying to the Crawford Produce Company the property of the ice company and the poultry and egg business of A. R. Loving & Co. and certain real estate purchased by the trustee, which deeds were filed for record in the recorder's office of Crawford county. The allegations of the amended bill, which the proof tends to support, were to the effect that A. R. Loving & Co.'s property which was turned over to the produce company for $14,700 was worth not to exceed $1500, and that the statement prepared by Loving and presented to the Secretary of State that at least half of the stock of the Crawford Produce Company had been paid for by the subscribers was untrue, and that the Secretary of State was misled in granting the charter because of these false and fraudulent statements. The bill further alleges that Loving, without the approval of defendants in error, caused the board of directors selected by him to issue stock certificates in which the common stock was wrongfully and fraudulently placed on a parity with the preferred stock,

and fraudulently and corruptly caused to be issued and delivered stock to other named persons, who, if they paid for the stock so issued to them, paid the money to Loving and it was not accounted for by him; that after Loving had induced the first board of directors to ratify and approve his acts with reference to the purchase of the property of the ice company and the stock of the poultry and egg business of A. R. Loving & Co. he procured the resignation of two of the members of the first board of directors and the selection of two of defendants in error, without their consent, to act as directors, and that the original board of directors had before this time elected defendant in error John S. Abbott, without his consent, as treasurer of the Crawford Produce Company, and that certain moneys paid by the subscribers on the capital stock were turned over to Abbott by Loving, which sums he is holding subject to disposition by order of the court. The prayer of the bill was that various transactions carried on by William E. Loving and the board of directors, as recommended by him, including those with reference to the ice company and the purchase of A. R. Loving & Co.'s poultry and egg business, should be canceled and set aside.

The bill was demurred to, generally and specially, by William E. and A. R. Loving, and also by the other members of the first board of directors, who were made parties defendant. On a hearing the general and special demurrer of the plaintiffs in error was overruled. The Secretary of State, who was made a party defendant, did not demur but answered, admitting the issuance of the charter to the Crawford Produce Company and denying that the charter was illegal and void, apparently on the ground that the statement filed with him appeared to be regular and legal and in compliance with the statute. A. R. Loving answered, denying any fraudulent design on the part of William E. Loving or himself or the other parties in securing the deeds from the ice company and the other deeds to William E.

Loving as trustee for the Crawford Produce Company, and insisting that the egg and poultry plants in which he was interested in Greenup and Robinson were not turned over at a fictitious value; denying any fraud on the part of the directors of the Crawford Produce Company, or any of them, with reference to obtaining the charter from the Secretary of State and the selection and naming of the first board of directors; denying that any fraudulent representations were made at the incorporation of the company as to the paid-up subscriptions, in the report to the Secretary of State, and further representing that the business of the Crawford Produce Company would have been a success if it had been properly supported by the subscribers to its capital stock. William E. Loving stood by his demurrer to the amended bill and did not appear in person on the trial of the case in the circuit court or testify or offer any evidence on his own behalf on that hearing. The testimony of several of the subscribers was to the effect that Loving promised them that he and his father would put in $30,000 cash, as we understand the record, in the stock of the proposed corporation; that Loving was asked to put such statement in writing, and thereafter came back with a letter stating that he would put in $25,000 or $30,000, but this letter was not produced in evidence, and it is claimed by counsel for plaintiffs in error that no such letter was ever written.

John S. Abbott, one of the defendants in error, is president of the Crawford State Bank at Robinson and also president of the Chamber of Commerce in that city, and seems to have been financially interested in the ice company before its purchase by the board of directors of the Crawford Produce Company. He testified that he talked with William E. Loving about selling the business of the ice plant and increasing the capital stock of the produce company, and told Loving if the ice plant were taken over and the capital stock increased he would take 50 shares of the preferred stock and 25 shares of the common stock, with the under-

standing that local men chosen from a designated list should manage the business; that his understanding with Loving was that after the stock subscriptions were obtained there was to be a meeting of the stockholders who had signed the subscription list, to elect a board of directors and talk over the policy of the new company. Certain other witnesses testified substantially the same as Abbott as to the method agreed upon for choosing the directors. The testimony also tended to show that some of the cash paid by the subscribers had been turned over by Loving to Abbott but no subscribers' meeting had been called. Abbott also stated that he told Loving that he was attempting to unload the poultry and egg business at Greenup and Robinson, which was run in the name of A. R. Loving & Co., at a fictitious value of $14,700; that during a conversation with A. R. Loving the latter admitted that the plant at Greenup was only worth about $1600 and the one at Robinson about $500, and that then Abbott told the elder Loving that restitution would have to be made as to this transaction before he would act as director of the Crawford Produce Company. The weight of the evidence in the record on the hearing tends strongly to show that the poultry and egg business at Greenup and Robinson was not worth to exceed $1500 or $1600.

The main contention of counsel for plaintiffs in error is, not that the property that was taken over by the board of directors of the new produce company was not overvalued, but that for various reasons the court was without authority in this proceeding to grant the relief asked for by the amended bill. Among the objections of plaintiffs in error on this point,—possibly the one most relied on,— is, that the bill as drawn is multifarious, and that therefore the demurrer thereto should have been sustained by the trial court. This court has discussed in several cases whether or not a demurrer to a bill in chancery should be sustained on the ground that the bill was multifarious, as here drawn,

and the court has said that it is impossible to lay down any rule universally applicable and controlling on this question or to say with certainty what constitutes multifariousness as an abstract proposition, under the authorities; that there is no settled and inflexible rule; that the modern tendency of the courts is to relax the rigid rules of pleading and to hold that a bill is not multifarious where causes set forth in the bill may more conveniently be tried in a single suit, where it will avoid a multiplicity of suits, and where the relief sought in each cause is of the same general character and no unreasonable hardship will be caused the parties against whom the relief is asked. It was held that a bill under such circumstances is not multifarious. (*Anderson* v. *Anderson,* 293 Ill. 565; *First Nat. Bank* v. *Starkey,* 268 id. 22.) "A bill is not necessarily rendered multifarious by reason of the fact that there may be united in it several causes of action. If all the different causes of action united in the bill grow out of the same transaction, and if all the defendants are interested in the same rights and the relief against each is of the same general character, the bill may be maintained. No bill is multifarious that presents a common point of litigation, the decision of which will affect the whole subject matter and will settle the rights of all the parties to the suit." (10 R. C. L. 430; see, also, on this point, 20 Stand. Ency. of Procedure, 62.) In discussing this question this court said in *North American Ins. Co.* v. *Yates,* 214 Ill. 272: "The essence of the charge is the common scheme among the individual defendants and others, and the officers in control of the insurance companies, to violate and disregard the insurance laws of the State and to defraud persons obtaining policies from them. * * * The relief asked against all is the same and the acts complained of are all part of the common plan, and we are of the opinion that the bill is not multifarious." It is obvious, under the allegations of the amended bill in this case and the proof heard at the trial

in the circuit court, that the plaintiffs in error were engaged in a common scheme in attempting to defraud defendants in error, and the argument that the bill is multifarious, under the authorities, must be held to be without merit.

Counsel for plaintiffs in error also urge that the allegations of the bill are not of the character to give a court of chancery authority to interfere in the matter. With this contention we do not agree. In *Wampler* v. *Wampler,* 30 Gratt. 454, the court said (p. 459): "Courts of equity have an original, independent and inherent jurisdiction to relieve against every species of fraud, * * * but none of such devices or instruments will be permitted by a court of equity to obstruct the requisition of justice. If a case of fraud be established a court of equity will set aside all transactions founded upon it, by whatever machinery they may have been effected and notwithstanding any contrivance by which it may have been attempted to protect them." This doctrine is quoted with approval in Pomeroy's Equity Jurisprudence. (Vol. 2, 3d ed. sec. 914.) That learned author states that in administering remedies, pecuniary as well as equitable, "the fundamental theory upon which equity acts is that of restoration,—of restoring the defrauded party primarily, and the fraudulent party as a necessary incident, to the positions which they occupied before the fraud was committed. Assuming that the transaction ought not to have taken place, the court proceeds as though it has not taken place and returns the parties to that situation." (Ibid. sec. 910.) The proof in the record, with the allegations of the bill, tends to show that William E. Loving attempted and intended to perpetrate a fraud upon the stockholders of the proposed corporation,— not so much, perhaps, by mis-statements directly inserted in the subscription paper for obtaining stockholders, but because he represented to the subscribers for the stock that the names of the directors, other than his father, would be chosen from among certain designated persons recom-

mended by the subscribers and in whom they apparently
had much confidence, and that the local directors repre-
sented by such subscribers of the stock would control the
management, but notwithstanding such representations the
directors actually selected were special friends or relatives
of Loving who had not been mentioned to the subscribers
and who proceeded to take over the Loving property at a
greatly inflated value. There are other acts indicating bad
faith shown in the record. From the record it does not
appear that the subscription lists themselves, signed by the
subscribers to the stock, had attached to them a copy of
the statement giving the names of those who were to be
selected as directors when the company was organized, al-
though the lists stated that such a statement was attached;
but there is evidence in the record showing that Loving,
when the fact of such statement not being attached to the
subscription lists was mentioned, said that they could attach
the paper later, when the subscribers had selected the di-
rectors. It would appear from the record that when he had
secured the necessary subscriptions by means of represent-
ing that good business men, bankers, etc.,—trusted men in
Robinson and vicinity,—were to be selected as directors,
instead of advising with the stockholders with reference to
the list of directors to be chosen he placed in the state-
ment sent to the Secretary of State the names of directors
chosen by himself, including his father, his brother-in-law,
one Chicago friend and two other men, none of whom were
recommended or suggested by the stockholders of the pro-
posed corporation, and that this board, apparently recom-
mended by Loving alone, was under the provisions of the
present Corporation act named by the Secretary of State
in the copy of the statement attached to the charter when
it was issued, as the directors of the company. It would
also appear from the record that after the charter was
granted by the Secretary of State these men named as di-
rectors met and organized, apparently at the suggestion of

Loving, and took over at a fictitious value the two small poultry and egg enterprises formerly owned by A. R. Loving & Co., so that the partnership was to receive several times what the business was worth if the transaction was carried out as agreed to by the directors of the Crawford Produce Company. The allegations of the bill are also to the effect that Loving accepted several thousand dollars' worth of subscriptions himself, and procured the "dummy board," as defendants in error and their attorneys call it, to issue stock for these subscribers, and the evidence tends to show that a certain portion of this money thus obtained for these subscriptions was kept by Loving and not turned over to Abbott, the temporary treasurer of the new corporation.

The courts have held very similar transactions as to obtaining subscriptions and organizing a corporation such fraud that courts of equity would interfere. In *Terwilliger* v. *Great Western Telegraph Co.* 59 Ill. 249, where a number of persons organized a telegraph company and one of the number subscribed for nearly all of the stock and transferred it to another person to hold as trustee and to represent and sell the same but no money was to be paid for said stock by those organizing the company, and such subscriber, by contract with the company, undertook to build two thousand miles of line with the agreed price largely above the cost of construction, it was held that equity would interfere to prevent the carrying out of such an agreement and compel the corporation to set aside its fraudulent transactions.

In the recent case of *Tevander* v. *Ruysdael*, 253 Fed. 918, the Federal court of appeals for the northern district of Illinois sustained a bill in chancery to set aside for fraud the transactions of one of the promoters of the organization for taking over the business of a partnership. The bill in that case practically asked for the same relief as to the organization of the corporation, the conduct of its business and the setting aside of the transactions that led to its in-

corporation as is asked for in this bill, and the opinion, in discussing the right of the court of equity to interfere with the acts of the corporation as thus organized, said (p. 923): "If appellee was induced to enter the agreement to dissolve the partnership and create the corporation through the fraudulent representations of Tevander, will a court of equity permit the latter to escape liability by hiding behind the fictitious third party, the corporation, the stock of which he and appellee are the sole owners? The assets of the co-partnership were turned over to this corporation by reason of the action of the co-partners, which action was induced by the fraudulent representations of appellant, Tevander. This fact being shown, the right of the corporation to the assets of the co-partnership is subject to be defeated upon proof that fraud was practiced upon the co-partnership. In other words, the title of the corporation to the assets here involved rests upon an assignment from the co-partnership. Contemporaneously executed and indorsed on the back of the assignment is an agreement to dissolve the co-partnership. Both assignment and agreement to dissolve in turn rest upon the written agreement of Tevander and appellee (*a*) to dissolve the co-partnership, (*b*) organize the corporation, and (*c*) assign to the latter the assets of the former. If fraud tainted the last-named agreement its consequences reach all three transactions. Even though the corporation may not be dissolved, no good reason is advanced why it should hold property under an assignment secured through fraud." See, also, somewhat similar reasoning in *Barcus* v. *Gates,* 89 Fed. 783.

Without question, under the allegations of the bill and the evidence in the record, the subscriptions to stock in the Crawford Produce Company by some, if not all, of defendants in error were obtained by Loving through fraudulent representations, and there can be no question, also, that the transactions as to the purchase of the egg and poultry busi-

ness of the Lovings by the dummy board of directors must be held fraudulent.

Counsel for plaintiffs in error do not appear seriously to contend that the allegations in the bill and the proof do not show that fraud was committed in certain respects in obtaining subscriptions for the stock and in the election of the stockholders and the transactions that were performed by the dummy board, but they contend very forcibly that such a question cannot be raised by a bill in chancery, and that a corporation, after it has been organized and a charter granted by the proper officials of the State, cannot be dissolved by a bill in chancery. It is the settled law of this State that courts of chancery have no jurisdiction, in the absence of statutory authority, to decree a dissolution of a corporation or decree a forfeiture of its franchise; (*Wheeler* v. *Pullman Iron and Steel Co.* 143 Ill. 197; *People* v. *Weigley,* 155 id. 491;) but this court has also held that such jurisdiction may be conferred upon chancery courts by statute. (*Chicago Life Indemnity Ass'n* v. *Hunt,* 127 Ill. 257; *Hunt* v. *LeGrand Roller Skating Rink Co.* 143 id. 118.) "Where a corporation does an act which its charter does not authorize it to do or which its charter or a statute expressly prohibits it from doing, such an act may, under certain circumstances, subject the corporation to the penalty of a dissolution." (*Bixler* v. *Summerfield,* 195 Ill. 147.) Section 25 of the Corporation act, before the act was amended in 1919, provided that "courts of equity shall have full power, on good cause shown, to dissolve or close up the business of any corporation, to appoint a receiver therefor who shall have authority, by the name of the receiver of such corporation, * * * to sue in all courts and do all things necessary to closing up its affairs, as commanded by the decree of such court." (Hurd's Stat. 1917, p. 703.) And this court in *Wheeler* v. *Pullman Iron and Steel Co. supra,* in discussing this section of the statute as to good cause, said (p. 207):

"We are of opinion that it is only 'as a portion of the re-
lief provided for by that section' that the power to dissolve
the corporation can be invoked. Moreover, 'good cause'
for dissolving the corporation would necessarily be a legal
cause,—a cause for which the sovereign authority might by
law resume the franchise granted. It cannot be presumed
that the legislature intended, by the use of the language
here employed, to authorize a decree forfeiting the corpo-
rate franchise for causes for which the State might not
procure judgment of forfeiture at law." The doctrine of
this court in that case on this point is referred to with ap-
proval in *Bixler* v. *Summerfield, supra.* Obviously, whether
the Crawford Produce Company was organized under the
Corporation law or not, and whether it was a *de facto* or
a *de jure* corporation, the allegations of the bill and the
proof in the record as to fraud perpetrated by the so-called
dummy board of directors, and as to the mis-statements in
the statement sent to the Secretary of State, show a state
of facts so fraudulent that the State by direct proceedings
would have been justified and authorized to forfeit the char-
ter by *quo warranto* proceedings. The issuing of stock by
a corporation fraudulently as fully paid up, when, in fact,
it is not actually paid, renders the charter of such cor-
poration liable to forfeiture at the instance of the State.
(1 Cook on Corporations, p. 125.)

It would seem clear under the reasoning of this court
in *Wheeler* v. *Pullman Iron and Steel Co. supra,* and the
other authorities cited, that the acts of the first board of
directors of the Crawford Produce Company were of such
nature as to justify the forfeiture of its charter by the State
under section 54 of the new Corporation act, (1 Hurd's
Stat. 1921, p. 803,) which last section is worded substan-
tially as was section 25 of the Corporation act in force
prior thereto, and therefore, under the decisions of this
court heretofore cited, these acts justified the appointment
of a receiver and the dissolution of the corporation by a

bill in equity under section 54. Properly understood, nothing has been said to the contrary in any of the decisions cited and relied on by counsel for plaintiffs in error, such as *Coquard* v. *National Linseed Oil Co.* 171 Ill. 480, *Lincoln Park Chapter R. A. M.* v. *Swatek,* 204 id. 228, and *American Trust Co.* v. *Minnesota and Northwestern Railroad Co.* 157 id. 641. In all of the decisions relied on by counsel for plaintiffs in error to sustain their position that it is only by direct proceedings that the corporation can be dissolved, it is manifest that the court did not intend to say that corporations could not be dissolved by a bill in chancery if the allegations and proof justified their dissolution under the provisions of former section 25 as construed by this court. This court said in *Coquard* v. *National Linseed Oil Co. supra,* on page 485: "Courts of chancery have no general power to appoint receivers of corporations and can only appoint them where expressly authorized by the statute. In the absence of statutory authority they have no jurisdiction to decree the dissolution of a corporation by decreeing a forfeiture of its franchise. (*Wheeler* v. *Pullman Iron and Steel Co.* 143 Ill. 197; *Chicago Steel Works* v. *Illinois Steel Co.* 153 id. 9; *People* v. *Weigley,* 155 id. 491.) The whole power of a court of equity in such cases is derived from section 25, chapter 32, of the Revised Statutes. Complainant did not bring himself within any provision of that section and is not entitled to the appointment of a receiver or dissolution of the corporation."

Defendants in error did not pray for the appointment of a receiver under the provisions of section 54 of the present Corporation act, which is similar to the provisions of former section 25 of the act as to the appointment of a receiver, to do all things necessary to closing up the business of the corporation. In view of the condition of the affairs of the corporation as shown by this record, under the allegations of the bill and the proof the circuit court was justified in entering the decree declaring void the various

deeds referred to in the amended bill and passed upon by the decree, and also in declaring void the subscriptions of defendants in error for stock, and as there does not seem to be anything in the record that indicates that there was any indebtedness of the corporation, after it was chartered, to third parties not involved in the fraud connected with the company's organization, it does not seem necessary at this stage of the proceedings to require that the decree be reversed for the appointment of a receiver. While, doubtless, it would have been the better practice to have prayed for the appointment of a receiver and not to have taken final action as to the distribution of the assets of the corporation and final dissolution of the same until after a report from the receiver, we cannot see that any injustice has been done to any of the parties, whether plaintiffs in error or defendants in error, by entering the decree herein questioned, setting aside the fraudulent acts of plaintiffs in error and decreeing the final dissolution of the corporation without the appointment of a receiver. The allegations of the bill and the evidence found in the record justified the various provisions of the decree.

Some other questions are raised with reference to the pleadings and certain other issues which counsel for plaintiffs in error assert are involved in this record, but as the questions that we have passed upon settle the real merits of the controversy we do not deem it necessary to discuss or pass on the other questions raised in the briefs.

In view of what has already been said, the decree of the circuit court is correct and should be and is affirmed.

*Decree affirmed.*

Mr. CHIEF JUSTICE THOMPSON, dissenting.