Loewenthal Securities Company, Appellee, v. White Paving Company and The White Construction Company, Appellants.

Gen. No. 34,372.

Heard in the second division of this court for the first district at the June term, 1930. Opinion filed January 27, 1931.

GEORGE F. BARRETT and CHARLES V. BARRETT, for certain appellant. WILLIAM C. WERMUTH, for certain other appellant.

MAYER, MEYER, AUSTRIAN & PLATT, for appellee; FREDERIC BURNHAM and RICHARD MAYER, of counsel.

MR. JUSTICE KERNER delivered the opinion of the court.

Complainant by its bill asks that a certain writing executed by the City of Chicago and the defendant, The White Construction Company, may be decreed to be in fact the contract of said City of Chicago and the defendant White Paving Company, or to have been made for the benefit of said White Paving Company and that the contract be specifically performed and for an injunction. The court found the facts in favor of the complainant and entered a decree March 1, 1930, that the complainant recover from the defendants and

each of them $210,458.76. The present appeal followed.

The complainant is an investment banking house in Chicago, engaged in financing contractors by purchasing from them, at a discount, special assessment improvements bonds and vouchers issued by the City of Chicago to contractors in payment for work done by contractors for the city, and reselling such bonds and vouchers on the open market. The defendant White Paving Company is a contracting firm which has engaged extensively in public improvement work in Chicago of the kind paid for by special assessments levied against benefited property, confining its activities entirely to the City of Chicago. The other defendant is also a contracting firm engaged in road building, its activities having been confined exclusively to territory outside the City of Chicago. It had never bid for a job in the City of Chicago prior to the one in question. The complainant had had business relations with White Paving Company prior to May 23, 1922, the date of the contract in question, purchasing from it, pursuant to contract, special assessment bonds and vouchers.

September 30, 1921, complainant entered into a contract with White Paving Company whereby the latter agreed to sell to it at 90 cents on the dollar all its special assessment bonds and vouchers delivered to it by the City of Chicago. This contract also provided that White Paving Company would sell to complainant the complete issue of paper received by it in payment for work awarded White Paving Company by the City of Chicago during the year 1922. In the early part of 1922, H. B. Detweiler, associated with the White Paving Company, approached George Freudenthal, president of complainant, and attempted to repudiate that part of the contract of September 30, 1921, which permitted complainant to purchase the complete issue of

paper received by the paving company from the City of Chicago for work during the year 1922, claiming that he had signed the contract without consulting Michael E. White and without White's authority. White was the controlling figure in the White Paving Company and The White Construction Company. Freudenthal told him that the contract was entered in good faith and that he expected the paving company to carry it through. Shortly thereafter Freudenthal was approached by F. J. Herlihy, vice president of White Paving Company and general manager of The White Construction Company, who informed Freudenthal that Michael E. White had not realized that the contract of September 30, 1921, gave complainant the right to purchase paper issued for work done on contracts let in 1922, and that White wished to cancel the contract and enter into a new contract for that reason and for the further reason that the City of Chicago was proposing to issue 6 per cent paper as well as 5 per cent paper. Herlihy also stated that unless complainant acceded to White's request for a change of terms in the contract, White would bid for the City of Chicago's special assessment work in the name of The White Construction Company. Freudenthal replied that complainant had a bona fide contract.

Shortly after these conferences between Herlihy and Freudenthal, Freudenthal left the city, and upon his return found that the contract of September 30, 1921, was canceled and a new contract had been entered into dated May 23, 1922. This is the contract involved in this cause. This contract fixes the price of 5 per cent paper at 92 instead of 90, and the price of 6 per cent paper at 95, and permits White Paving Company to dispose of or retain for itself, an amount not in excess of $300,000 worth of paper which it may receive from the City of Chicago.

About the middle of September, 1922, Herlihy was sent by Michael E. White to complainant's office where he told Freudenthal that several large jobs were soon to be let by the City of Chicago and that White wished to have those jobs eliminated from the contract, particularly mentioning the Broadway sewer job and a new Ogden Avenue job. Herlihy was told that complainant had no intention of making any further change in the contract. Herlihy then informed Freudenthal that White had instructed him to say that unless those two jobs were excluded from the contract they would bid for the work under the name of The White Construction Company. The evidence also discloses that when White learned of the prospect of the Broadway sewer job he said he felt he could get a better price for the paper than he was getting under the contract with complainant and that if complainant agreed to exclude the Broadway sewer job, White would continue to bid for the work under the name of White Paving Company.

There were but two bidders for the Broadway sewer, The White Construction Company and the American Sewer & Drain Construction Company.

The evidence discloses that The White Construction Company had never built a sewer and that it had never bid for any work let by the City of Chicago prior to the time when Michael E. White had made his demand and threat through Herlihy. All the bids in the year 1922 up to the time of Herlihy's call on Freudenthal in the middle of September had been put in by White Paving Company. The first letting after White's threat was on September 26, 1922. The bid was in the name of The White Construction Company and the contract was awarded to that company. The bidding for the balance of the year was done by The White Construction Company; and that company was the successful bidder on twelve different jobs between

September 26, 1922, and December 31, 1922. At the beginning of 1923, White immediately commenced bidding in the name of White Paving Company and The White Construction Company never thereafter bid for any City of Chicago work. · It further appears that the work on The White Construction Company contract was done by the White Paving Company's crews.

The City of Chicago awarded the Broadway sewer work to the defendant, The White Construction Company, and a contract was entered into on October 28, 1922. About that time Herlihy again called on Freudenthal and told him that White had done just exactly as he stated they were going to do; that they had bid for the Broadway sewer and the balance of the 1922 paving jobs under the name of The White Construction Company; that he had with him a proposal executed by The White Construction Company which eliminated from the contract the special assessment vouchers which were to be received in payment for the Broadway sewer, and if Freudenthal would sign it, they would deliver the paper which they were to receive on the paving jobs. Freudenthal refused to sign the document.

A majority property owners' protest had postponed the starting of the work over three years. September 11, 1926, The White Construction Company entered into a contract with the South Shore Investment Company by which it sold the entire issue of the Broadway sewer special assessment paper for 97¼ on the dollar.

It appears that since 1913 the stock of the construction company had been in the hands of White and members of his immediate family with a qualifying director's share in the hands of Herlihy and Detweiler or some other officer or director. Michael E. White always owned a majority of the shares, his brothers, wife, sons and daughter holding the rest. · The paving

company was in much the same situation. At first Wm. J. Cooke had a 25 per cent interest in it, but at about the time of the transactions with which this case deals he sold all his interest to White, and the records of the construction company show that on February 21, 1923, Michael E. White owned all but three of the company's 250 shares, and his son, Herlihy and Detweiler each owned one of the remaining three shares. Michael E. White was always an officer and director in each company. The offices of both companies have always been in the same suite. The office force worked indiscriminately on the books of both companies.

The bill charges that when the White Paving Company learned that the Broadway sewer job was to be let it determined to bid for the work, but contrived to bring it to pass that it should not be required to sell complainant company the special assessment paper which it would receive from the city in payment for the work to be done on the job; that it attempted, unsuccessfully, to persuade complainant to exclude the Broadway sewer job from the operation of the contract of May 23, 1922, between complainant and the White Paving Company, and threatened that it would bid for the Broadway sewer job under the name of The White Construction Company instead of the name White Paving Company, if complainant did not accede to its request; that complainant refused, and thereupon White Paving Company, its officers and agents, conspired with The White Construction Company, its officers and agents, to bid, and, pursuant to and in furtherance of said conspiracy did bid for the Broadway sewer under the name of The White Construction Company with the fraudulent intent and purpose of evading its contract obligations with complainant and depriving complainant of the right to purchase, under the contract of May 23, 1922, the vouchers which the City of Chicago would issue in payment for the work

done. The court found these charges to be true and that Michael E. White and other officers and agents of the White Paving Company, with the fraudulent intent and purpose of evading its contract obligations with complainant and of depriving it of its right to purchase the vouchers which were to be issued on the Broadway sewer job, agreed with The White Construction Company and through said Michael E. White and others of its officers and agents to bid for the Broadway sewer job under the name of The White Construction Company, and it did so bid, and that The White Construction Company was awarded the contract; but that the contract, being the product of a scheme to defraud complainant, was in truth and in fact the contract of the paving company, and the court decreed that the contract entered into in the name of The White Construction Company and the City of Chicago for the construction of the Broadway sewer system was entered into for the benefit of the defendant the White Paving Company; and that it is the contract of the White Paving Company; and also decreed that The White Construction Company and the White Paving Company, by and through its officers and agents, combined and conspired together with the fraudulent intent and purpose of evading the obligations of the contract dated May 23, 1922, between defendant, White Paving Company, and the complainant, and by their combined acts intentionally induced the breach of said contract, and are liable jointly and severally to account to complainant for the damages suffered by complainant and to pay the same to complainant.

The main contention of the defendants is that there are no grounds for equitable relief and that the complainant has an adequate remedy at law. The rule is well settled that a party cannot resort to equity for relief when he has a complete and adequate remedy at

law. This rule is not disputed by the complainant, but it is contended that the bill alleges, and the facts prove, that the complainant is entitled to equitable relief; that the facts found by the trial court overwhelmingly establish that the defendants by concert of action perpetrated a fraud on the complainant and that a court of equity is the only forum which could adequately deal with the fraud. In *Wright v. McKinney,* 287 Ill. 529, the court said (p. 531):

"Fraud is a recognized subject of general equity jurisdiction, and there is no ground on which the jurisdiction is so readily entertained and freely exercised as that of fraud. (10 R. C. L. 316.) Courts of equity will relieve against fraud affecting substantial rights in whatever form it may appear, . . . It is immaterial in what form fraud appears or in what manner it is practiced or becomes effective to the injury of substantial property rights. . . ."

In *Abbott v. Loving,* 303 Ill. 154, the court said (p. 163):

"Courts of equity have an original, independent and inherent jurisdiction to relieve against every species of fraud, . . . but none of such devices or instruments will be permitted by a court of equity to obstruct the requisition of justice." See also *Nelson v. Rockwell,* 14 Ill. 375; *Mayr v. Chesman & Co.,* 195 Ill. App. 587.

Under the contract of May 23, 1922, between the complainant and the defendant White Paving Company, the complainant had the right to purchase all special assessment paper issued to the White Paving Company for work done under City of Chicago contracts let in 1922, and therefore had an interest in every city contract which the paving company executed in the year 1922. The contract of October 28, 1922, for the Broadway sewer between the City of Chicago and the defendant White Construction Com-

pany, was in pursuance of a fraudulent conspiracy between the two companies, the object of which was to deprive complainant of the Broadway sewer special assessment paper. It is proper for a court of equity to inquire into the facts, and if the facts warrant, hold that as between the complainant and the defendants that said contract should be regarded in equity and good conscience as a contract between White Paving Company and the City of Chicago, and equity will regard that as done which in good conscience ought to be done. The evidence discloses that there was no legitimate reason for taking the contract in question in the name of The White Construction Company. It was only because the complainant would not accede to White's demand that the Broadway sewer job be eliminated from the contract of May 23, 1922, that the contract was taken in the name of The White Construction Company, and it was solely for the purpose of circumventing complainant's contract with the White Paving Company. Equity will always entertain jurisdiction to relieve from fraud, notwithstanding that the law would offer relief, either by action or defense, where such remedy would be doubtful, incomplete or otherwise inadequate. (21 C. J. 109.) In the case of *Warfield-Pratt-Howell Co. v. Williamson,* 233 Ill. 487, at page 497, the court said:

"Plaintiffs in error seek to maintain the proposition that since the relation of the parties, as well as the relief sought, is purely legal, equity has no jurisdiction. Defendant in error seeks to uphold the jurisdiction of equity on the ground that the case falls within the exclusive jurisdiction of a court of equity. Neither of these contentions is sound. In our opinion the case belongs to that class where both the primary rights and the relief sought are purely legal and therefore cognizable in a court of law, but of which a court of equity will take jurisdiction on the ground that,

owing to the methods of procedure and the means available to carry its decrees into execution, its remedies are more adequate, complete and prompt than those afforded by a court of law. . . . It does not follow, however, that because the case is one in which a remedy at law is afforded, equity will not also take jurisdiction of the same state of facts to afford the same redress. If the remedy in equity is more adequate because of some special circumstance of the situation, the jurisdiction of equity will be sustained. . . ." See also *Cordell v. Solomon,* 234 Ill. App. 430, 439, and *People v. Small,* 319 Ill. 437, 445. In the light of the facts in the instant case we are not ready to say that the legal remedy was clear and adequate.

As we have said before, the right of complainant under its contract with the paving company was contingent upon the paving company taking a contract with the city; until it did, no special assessment vouchers would come to the paving company and no liability could arise to deliver such vouchers to the complainant. The two companies were really Michael E. White. He virtually owned or controlled all of the stock of each and directed their business. In the case of *Motley, Green & Co. v. Detroit Steel & Spring Co.,* 161 Fed. 389, in which the complainant and one of the defendant companies, the Detroit company, entered into a written contract whereby the Detroit company constituted the complainant its sole sales agent for certain territory for a certain product, complainant started upon its duties and secured large and valuable orders. Three months later Railway Steel Spring Company was organized and took over the plant, property and business of the Detroit company and most of its officers. Thereupon the Detroit company refused to quote prices to complainant company or to fill orders for goods obtained by complainant under its sales commission contract. Complainant charged that

the transfer of the property of the Detroit company to the Railway company was pursuant to a conspiracy to prevent complainant from performing its contract with the Detroit company, and to cause it to suffer the loss of the commissions upon the goods which it had sold or might have sold within the territory mentioned. In this case the court said at page 395:

"It is unnecessary to say that, if it is an actionable wrong for a third party to maliciously interfere in a contract between two parties and induce one of them to break that contract to the injury of the other, then it is an actionable wrong for a fourth party to conspire with and aid and assist such third party in perpetrating the wrong. In such case the conspiring parties would both be liable as joint wrongdoers. Now, if one of the contracting parties devises a scheme to avoid his contract and escape performance, and, perhaps, liability, by combining and confederating with a third person to pretend to transfer to him his property and the business to which the contract relates, making known to such third person his contract obligations and his object and purpose, such third person to pretend to be the owner and to have the possession of and the management of the business and refuse to give employment or business to the other contracting party pursuant to the contract, and deprive him of gains, profits, and advantages already partially earned, and prevent his full performance so as to deprive him of what he is entitled to, and such third party enters into and becomes a party to the scheme, and for a consideration aids to carry it into full effect to the damage of the other party to the contract, can it be said that here is not a conspiracy to commit a wrong by deception and wrongful acts, and that it has been consummated by the joint action of both parties? . . .

"If it be an actionable wrong for a third person to interfere in a contract and induce one of the parties thereto to break it to the injury of the other, can it be said it is not equally a wrong for one of the parties to the contract to invite a third party to unite with him and aid him in breaking the contract in such a way as possibly to escape liability in an action for nonperformance and, gaining his consent, to act together in consummating their agreement? There are many refinements in the law, necessarily so, but courts should be as astute in applying well-known principles of justice to remedy wrongs as the wrongdoers are in devising schemes to perpetrate them."

The *Motley, Green & Co. v. Detroit Steel & Spring Co.* case, *supra*, was an action at law, but the court treated the conspiracy to evade the contract as an actionable wrong and allowed complainant to proceed to recover damages for that evasion. It recognized the possibility that the device of the conspirator might have made it possible for the contracting defendant to have escaped liability for nonperformance, and held that the device itself was actionable. Equity will treat as done that which ought to have been done. All the circumstances, when considered together, lead us to the conclusion that the activity displayed by Michael E. White in the middle of September, 1922, when he sent Herlihy to Freudenthal, was to fraudulently deprive the complainant of its contractual obligations with the defendant paving company.

The defendants claim that the trial court had no right to disregard the corporate entity; that the two defendants are separate corporate entities in law and in fact, with different stockholders, business, etc., and that complainant recognized, dealt with and negotiated with both of these corporations as separate, distinct, legal and actual corporate entities. Courts will disre-

gard the corporate entity where .it is necessary to do so in order to prevent the perpetration of fraud. Particularly will courts of equity do this. (See *Higgins v. California Petroleum & Asphalt Co.*, 147 Cal. 363, 81 Pac. 1070.) In *Winestine v. Rose Cloak & Suit Co.*, 93 Conn. 633, 107 Atl. 500, D. E. and H. H. Levy had leased two buildings to Rose Cloak & Suit Company with the privilege of subletting and with a provision permitting it to renew its lease for a further term of five years upon giving six months' notice. The lessee leased a portion of the buildings to Jennie Winestine and granted her the privilege of continuing the lease for a further period of five years in the event that it, the Rose Cloak & Suit Company, should exercise its privilege of renewing the lease. The Cloak company gave the Levys the requisite six months' notice, but executed the lease in the name of Pauline Rosengarten. When Jennie Winestine asked for a renewal of the lease the Cloak company replied that it had not renewed its lease, and that thereafter her privilege of renewal was gone. The court said at page 501:

"This case turns upon the question whether the evidence was sufficient to warrant the conclusion of the trial court as to the purpose and effect of the renewal of the lease originally made to the plaintiff Jennie Winestine by the Rose Cloak & Suit Company.

"The motive with which an act is done may be, and often is, ascertained and determined by inference from the proofs of facts and circumstances connected with the transaction and the parties to it. *Sallies v. Johnson*, 85 Conn. 81, 81 Atl. 974, Ann. Cas. 1913A, 386.

"So in this case it appears that the new lease of the premises in question made by the Levys to Pauline Rosengarten is, like the old one, made to the Rose Cloak & Suit Company, except that the name of Pauline Rosengarten is substituted in the place of the

Rose Cloak & Suit Company; that Pauline Rosengarten was the president of the suit company; that she owned 27 of the 30 shares of the capital stock of the suit company; that of the three remaining shares 2 were owned by members of Pauline Rosengarten's family; that the rent to be paid under the new lease was the same that was paid by the plaintiff in the old lease made by her with the suit company; and that the management and control of the business of the suit company was not changed after the defendant Rosengarten claims that she obtained a lease in her own name from the Levys.

"The motive for the defendant's attempt to get rid of the plaintiff's privilege to renew can be found in the fact that prices for rent had greatly increased during the term of the plaintiff's original lease. Of this fact undoubtedly the trial court took judicial notice. These facts, in the absence of any satisfactory explanation, which was not given, warranted the court below in reaching the conclusions just referred to. It heard the parties, had the benefit of their presence and appearance, and, after considering all the circumstances, reached the conclusion that the lease from the Levys to Pauline Rosengarten was not made in good faith. An examination of the record does not disclose that this conclusion is without sufficient evidence to support it.

". . . The fact that Pauline Rosengarten took the lease in her name did not relieve the suit company from its obligation to fulfill its contract with the plaintiff."

In *Linn & Lane Timber Co. v. United States,* 196 Fed. 593, 598, 599 (affirmed 236 U. S. 574), the court said:

"The doctrine of corporate entity is not so sacred that a court of equity, looking through forms to the substance of things, may not in a proper case ignore

it to preserve the rights of innocent parties or to circumvent fraud.'' See also *Pain v. Kiel*, 288 Fed. 527, 530; *Ehlers v. Bankers Fire Ins. Co.*, 108 Neb. 756; *Advance-Rumely Thresher Co., Inc. v. Geyer*, 40 N. D. 18, 168 N. W. 731; *Donovan v. Purtell*, 216 Ill. 629; *People v. Michigan Bell Tel. Co.*, 246 Mich. 198, 224 N. W. 438.

Defendants urge as a ground for reversal of the decree that no equitable relief was granted and the court should not have retained the bill for the purpose of assessing damages. Where there is any ground of equity jurisdiction, a court of equity having acquired equitable jurisdiction to grant equitable relief will retain the case to do complete justice between the parties. (*Baker v. Salzenstein*, 314 Ill. 226, 234.) And in such a case a court will not ordinarily limit itself to the execution of partial justice and turn the parties over to a court of law, but will go on and dispose of all the matters at issue so as to do adequate and complete justice between all the parties. (*Braithwaite v. Henneberry*, 222 Ill. 50, 53.) In the instant case the chancellor decreed that the contract in question was a contract for the benefit of White Paving Company and to be regarded as the contract of White Paving Company and granted relief from it.

Complaint is made that complainant has neither alleged nor proved its readiness, ability and willingness to buy the Broadway sewer assessment vouchers and that the complainant has not proved a demand and an offer. Our examination of the record convinces us that it did aver and prove readiness, ability and willingness to perform and has made an offer and demand. Furthermore, the defendants put it out of their power to perform. Work on the Broadway sewer was commenced in November, 1926. The first voucher for such work was issued January 7, 1927, and was at once sold

by the defendant to the South Shore Investment Company. September 11, 1926, the construction company contracted with the South Shore Investment Company to sell to it all of the vouchers it was to receive in payment for work on the Broadway sewer. Where defendant refuses to perform or puts it out of its power to perform there is no necessity for complainant to aver or prove readiness, ability and willingness to perform. (*Wolf v. Willits,* 35 Ill. 88; *Missouri & Illinois Coal Co. v. Pomeroy,* 80 Ill. App. 144.) We have considered the argument of defendants that the bill was not diligently prosecuted and that the South Shore Investment Company is a necessary party to the bill and find no merit therein. Defendants claim that the damages awarded complainant are erroneous. After an examination of the evidence regarding this phase of the case we are led to the conclusion that there was no error in that regard.

We see no grounds for reversal and the decree of the superior court is affirmed.

*Affirmed.*

SCANLAN, P. J., and GRIDLEY, J., concur.