Religious Press Association, Appellant, *v.*
Sunday School Times Company et al.

Argued October 5, 1942.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, RHODES, HIRT and KENWORTHEY, JJ.

*Michael A. Coll,* for appellant.

*Thomas Raeburn White,* of *White & Staples,* with him *Edward F. Hitchcock,* for appellees.

OPINION BY KELLER, P. J., December 15, 1942:

The appellant, holder of fifty shares of preferred stock of appellee, a business corporation, filed a petition praying for its involuntary dissolution under section 1107 of the Business Corporation Law of May 5, 1933, P. L. 364, 15 PS §2852-1107. The president of the corporation was named an individual respondent.

That act provides that the court of common pleas *may* entertain proceedings for the involuntary winding up and dissolution of a corporation upon petition filed by a shareholder, when it is made to appear, inter alia:

"(1) That the objects of the corporation have wholly

failed, or are entirely abandoned, or that their accomplishment is impracticable; or

"(2) That the acts of the directors, or those in control of the corporation, are illegal, oppressive, or fraudulent, and that it is beneficial to the interests of the shareholders that the corporation be wound up and dissolved; or

"(3) That the corporate assets are being misapplied or wasted, and that it is beneficial to the interests of the shareholders that the corporation be wound up and dissolved." [1]

Appellant's petition was alleged to be based on these three reasons.

The underlying facts in the case are not in dispute.

The corporate appellee, The Sunday School Times Company, publishes two periodicals, The Sunday School Times and Christian Youth. The Sunday School Times is issued weekly and has a wide circulation among ministers, Sunday school teachers and Bible students in all parts of the world. It was established in 1859 by the American Sunday School Union and has been continuously published under various ownerships ever since. It was *incorporated* in April, 1900, with a capital stock of $300,000, divided into 1500 common shares, and 1500 preferred shares, of a par value of $100 each.

Appellant formerly represented this publication in securing advertising. This began in 1882 and continued until 1938 when the contract was terminated. It purchased fifty shares of preferred stock in 1900, which it still owns. Dividends were paid on the stock for many years, but none have been declared or paid for some time. After the termination of its advertising soliciting contract, appellant demanded that the corporation or its management purchase its stock at $50

---

[1] A fourth reason is also included, viz., 'deadlock in the management of the corporate affairs', which is not here involved.

a share, threatening that if it did not do so, a petition for dissolution of the corporation would be filed.

The petition specifically alleged that the officers of appellee corporation were in control of the company and had paid themselves excessive salaries over a period of many years and in this way had taken "huge amounts of money from the business of the said corporate respondent to the detriment of the interests of the stockholders"; that contributions to the work of The Sunday School Times had been solicited and received to the extent of over $80,000 in the past six years; that the officers of the company had "borrowed huge sums of money on every available corporate asset and went to the extent of borrowing collateral in order to negotiate further loans"; that by reason of mismanagement there had been a net operating deficit of $69,000 over the period of the last ten years and an accumulation of accrued dividends on outstanding preferred stock amounting to $220,000; that nearly all of the capital assets of the company had been "spent, misapplied and wasted" by the appellees in the maintenance of the said excessive and exorbitant payroll and that "the business of the corporate respondent is now in such a condition that it is within a small sum of reaching a state of bankruptcy"; that there was little likelihood of improvement; and that the company should be wound up and its assets distributed to its stockholders. The petition prayed for dissolution and the appointment of a receiver.

The answer denied mismanagement and recited in some detail the history of the company; admitted that charitable contributions had been received by persons desiring to assist it in its religious work and averred that they were used solely for that purpose; denied that huge loans had been made and averred on the contrary that there was only one outstanding loan amounting to $500; admitted that there had been an operating

deficit of $69,000 over the past ten years, but averred that this had not been due to mismanagement but to world-wide conditions over which appellee had no control.

The answer also alleged that the condition of the company had markedly improved after the contract with appellant had been terminated, and that its operations had shown a net income of more than $4000 for the fiscal year ending March 31, 1941.

At the trial appellant produced but one witness, an accountant who had never examined the books of appellee, but had examined and analyzed certain financial reports of the regular auditors of appellee.

Appellant also called for cross-examination two of the officers of appellee corporation, but their testimony added nothing to what had been shown by the accountant. The testimony of the accountant related solely to the financial operations of the corporate appellee as shown by its reports for the ten years prior to March 31, 1940, omitting any reference to the fiscal year ending March 31, 1941, although it had ended before the petition was filed, May 29, 1941.

There was no evidence as to mismanagement or excessive salaries. The evidence of the accountant showed that an average of $18,417.55 per year was paid as salaries to the four principal officers of the company over a period of ten or more years, an average of approximately $4600 each. Counsel for appellant stated of record that he did not allege that the corporate appellee is now insolvent, and admitted that at the present time it has a substantial surplus of assets over liabilities.

At the conclusion of appellant's case the Court granted a motion to dismiss the petition without hearing further testimony. Appellant filed exceptions to certain rulings on evidence and to the decree of the Court in dismissing its petition; and its assignments

of error are confined to the dismissal of these exceptions. We find no error in the action of the Court on these matters.

### RULINGS ON EVIDENCE

No formal offer was made by the petitioner's counsel as to his purpose in asking the questions objected to—what he proposed to prove by them; but the accountant, called by petitioner, testified that the auditor's reports showed an operating loss for the ten year period ending March 31, 1940 of $69,000 and that contributions amounting to $54,676.09 had been received and credited to 'donated surplus'; and that one donor had, in addition, contributed $26,284.44 to be used in the promotion of circulation. Counsel for petitioner, Mr. Coll, then asked the following questions:

"Q. You say this fund [$26,284.44] was not carried on the books of the company as an ordinary bookkeeping item?

"A. That is right, it was a separate account.

"Q. If added to the operating loss of the company for the ten year period, what would the total amount of loss be?

"A. If it were added to the loss?

"Q. Yes.

"A. There is no loss.

"Q. Deficit.

"A. As I understand the question, if that donation was not to be made or so expended, the loss would be increased.

"Q. I beg your pardon, I am asking you if this special fund, the amount of this special fund, was added to the operating loss of the company for the ten year period, what would the resulting amount be?

"The Court: Why would you do that?

"Mr. Coll: What?

"The Court: Why would you add a donation to the loss?

"Mr. Coll: Because this item of expense is ordinarily carried by the business itself.

"The Court: I do not get any sense out of that.

"Mr. Coll: I have stated in my opening address that the amount of operating loss for the ten year period was $69,000.

"The Court: Here is a man who has given the company some money to spend and they spent it.

"Mr. Coll: Yes, sir.

"The Court: That is all there is to it.

"Mr. Coll: What I am trying to show in this case is that this company cannot operate at a profit, mainly and mostly—

"The Court: You do not have to ask him that question, you have shown somebody has donated some money and it has been spent for advertising, and still .[they] had an operating loss over the period.

"Mr. Coll: Yes, but, if Your Honor please, the point I am trying to make is, this was an ordinary expense that should have been incurred by the business itself.

"The Court: Not necessarily.

"Mr. Coll: I am trying to show the operating conditions of this company.

"The Court: That does not necessarily follow, the business might not have wanted to spend that much money in increasing circulation, they might have wanted to spend the money doing something else, getting advertising or increasing the editorial staff or something of that sort, but here is somebody who has, out of the goodness of his heart, donated some money to spread the word the Sunday School Times has to a wider circle of people, and it has nothing to do with loss or gain ......

"Mr. Coll: I think I am entitled to ask that question simply by way of adding to the picture in this case, and I would ask Your Honor to rule on it.

"The Court: Ask the question over again.

"By Mr. Coll: Q. If this item, the special fund of $26,284.44, was added to the operating loss, what would the total amount of loss be for that period?

"Mr. White: [Counsel for respondents] I object to that.

"The Court: You do?

"Mr. White: Yes.

"The Court: I sustain the objection."

As respects the sum in addition, the court was able to get the correct answer without the help of the witness. But the court was right in its position that the fact that the company had spent a *gift* of $26,000 in an effort to increase the circulation of The Sunday School Times, in accordance with the request of the donor, did not constitute the expenditure an ordinary 'operating loss' to be considered as such in this proceeding.

### DISMISSAL OF PETITION

On this feature of the case, the record sustains the following excerpt from the opinion of the court below: "The record shows that the petitioner failed to adduce evidence that the 'objects of the corporation have wholly failed or are entirely abandoned, or that their accomplishment is impracticable,' or that the acts of 'those in control of the corporation, are illegal, oppressive or fraudulent,' or that 'the corporate assets are being misapplied or wasted, ......'." To which, we add, it has likewise failed to show that it would be "beneficial to the interests of the shareholders that the corporation be wound up and dissolved."

Our review of the record leads us to agree with counsel for the appellees in the following statement: "On the contrary, it was shown that the work of the Sunday School Times has been carried on steadily for a period of eighty-two years and is still continuing; that while the corporation has suffered deficits for the past ten years (a period during which substantially

every corporation in the country had a similar experience), its condition has improved so that during the last fiscal year prior to the filing of the petition it made a net profit of $4087.46 (R. 22a) and is now solvent. It cannot be claimed that the work of the Sunday School Times has been abandoned and the above facts show that its accomplishment is not impracticable. Its operations now show a profit and even if it were otherwise, past experience has shown that there is sufficient interest in the work of the Sunday School Times throughout the world for interested friends to come to its support if at any time its operations are such that its continuance appears to be in jeopardy."

The section of the Act of 1933, supra, under consideration in this case, is new in the law of this Commonwealth, and we have found no decision of our appellate courts construing it. Somewhat similar statutory provisions have been passed upon in other jurisdictions and while not controlling they are helpful in the decision of this case. See *Phinizy v. Anniston City Land Co.*, 195 Ala. 656, 71 So. 469, 471, 472 (cited by our Supreme Court in *Hall v. City Park Brewing Co.*, 294 Pa. 127, 134, 143 A. 582, 584); *Dixie Lumber Co. v. Hellams*, 202 Ala. 488, 80 So. 872; *Mfrs. Land & Imp. Co. v. Cleary et al.*, 89 S.W. 248, 249 (Ky.); *Worth Mfg. Co. v. Bingham*, 116 Fed. 785, 793 (4th C. C. A.); *Graham-Newman Corp. v. Franklin County Distilling Corp.*, 27 A. 2d 142 (Del.). See also, *In re Suburban Hotel Co.*, Law Reports 1866-67, 2 Chancery Appeal Cases 736, 737; 16 Fletcher on Corporations, sec. 8081, pp. 807-809.

The assignments of error are overruled and the decree is affirmed at the costs of the appellant.