403 A.2d 1319

**Anna O'FARRELL, Appellant,**

**v.**

**STEEL CITY PIPING COMPANY, a corporation, John M. Cuddyre, Jr., John O'Farrell, Jr., and Trustees of Steel City Piping Company Profit Sharing Plan.**

Superior Court of Pennsylvania.

Argued April 13, 1978.

Decided Oct. 20, 1978.

Rehearing Denied Dec. 29, 1978.

Petition for Allowance of Appeal Denied March 2, 1979.

220

222

James C. Larrimer, with him Dougherty, Larrimer & Lee, Pittsburgh, for appellant.

Leo P. Hajdukiewicz, Pittsburgh, for appellees.

Before JACOBS, President Judge, and HOFFMAN, CERCONE, PRICE, VAN der VOORT, and SPAETH, JJ.

HOFFMAN, Judge:

Appellant contends that the chancellor erred in refusing to grant her the following relief: (1) reinstatement as an employee in appellee corporation until such time as the individual appellees purchase her stock at book value, (2) reimbursement for all employment-related benefits lost as a result of her impermissible firing, (3) specific performance of appellees' obligation to purchase her stock at book value, and (4) dissolution and liquidation of appellee corporation. We affirm the order of the lower court dismissing appellant's exceptions and entering a final decree.

While the instant case is factually quite complicated, the parties do not dispute the essential chronology of events. On April 30, 1959, John O'Farrell, Sr., John O'Farrell, Jr., and John M. Cuddyre, Sr., and John M. Cuddyre, Jr. formed appellee Steel City Piping Company (hereinafter Steel City) in order to conduct their plumbing, heating and air conditioning business. On May 1, 1959, these parties, owners of all Steel City shares signed an agreement designed to restrict each signator's ability to dispose of his stock. In pertinent part, the agreement provided that if John O'Farrell, Sr. predeceased his son, John O'Farrell, Jr. would have an option to purchase his father's shares at book value within a period of thirty days following the appointment of a legal representative. If John O'Farrell, Jr. failed to exercise this option, the agreement accorded John M. Cuddyre, Sr. and/or John M. Cuddyre, Jr. a similar option. Moreover, the agreement provided that if the shares of John O'Farrell, Sr. passed to his widow, appellant Anna O'Farrell, by operation of law, Anna O'Farrell agreed that the option provisions specified in the agreement would be effective and

exercisable against her.   Anna O'Farrell signed this agreement.[1]

In August, 1967, John O'Farrell, Sr. died.   At the time of his death, O'Farrell owned 315 shares of stock, John M. Cuddyre, Jr., owned 450 shares,[2] and John O'Farrell, Jr. owned 135 shares.   The decedent's 315 shares passed to his widow by operation of law.   Neither her son nor John M. Cuddyre, Jr. exercised the option available under the 1959 buy-sell agreement to purchase her shares.   Instead, John M. Cuddyre, Jr., John O'Farrell, Jr., and appellant executed a new buy-sell agreement on September 22, 1967.   This agreement rescinded all rights of interested parties under the 1959 agreement and provided, in pertinent part:

"2.   In any event where the value of the stock shall become a matter of importance in connection with any transfer hereunder, it is agreed that the book value of said stock shall be used to determine the value thereof.   .   .   .

"3.   It is agreed that restrictions are being imposed upon the transfer of said stock so as to prohibit their transfer to persons other than those designated herein, and further to afford maximum benefits to the surviving spouse of a deceased party.

"In addition, said restrictions are designed to perpetuate the ownership of said stock in certain parties designated herein.

"4.   In the case of Anna O'Farrell, it is agreed that she shall be permitted to retain the interest of her deceased husband, John O'Farrell, Sr., which title vested in her exclusively by operation of law, by virtue of said stock having been held as tenants by the entireties, *for a period not to exceed Five (5) years from the date of this agreement.*

"During such time, Anna O'Farrell shall be entitled to participate fully in the distribution of profit of said business,

1.   This agreement contained similar restrictions and options in regards to John M. Cuddyre, Sr., John M. Cuddyre, Jr., John O'Farrell, Jr. and each signator's respective spouse.

2.   John M. Cuddyre, Jr. had inherited his father's stock.

and to become a paid employee of the corporation if she so desires such employment.

"In the event of the death of Anna O'Farrell, or if she should declare her intention, in writing, to divest herself of ownership of all or part of the stock held by her, it is agreed that her son, John O'Farrell, Jr., shall be entitled exclusively to purchase said stock within a period of time agreeable to the personal representative of the estate of Anna O'Farrell, or in the event of an *inter vivos* transfer, under such terms as she and her said son may agree upon.

"In the event John O'Farrell, Jr. shall not exercise his right to purchase said shares, then said certificates shall become available for purchase by John M. Cuddyre, Jr., under terms and conditions to be agreed upon between the parties.

.     .     .     .     .

"8. Notwithstanding any other conditions or terms set forth in this agreement, relating to the rights of first rejection accorded to the various present shareholders or their spouses, it is further agreed that any holder of stock shall be entitled to offer said stock for sale or transfer, either for or without consideration, to any third party, in the event those parties otherwise entitled to purchase said stock shall have relinquished said right."[3] (Emphasis in original).

On September 29, 1967, John M. McCuddyre, Jr., John O'Farrell, Jr. and Anna O'Farrell executed a profit sharing plan. This agreement provided, in pertinent part:

"2. The parties agree that they shall share equally on a one-third percentage basis each in those profits which amount to Fifty percent of the excess of profits over the first $25,000.00 earned by the corporation of any given year, to-wit, from the 30th day of April to the 30th day of April of the next year following.   .   .   .

"6. A party shall be entitled to receive the benefits set forth herein only so long as he shall remain an officer and employee of the corporation."

**3.** The agreement also provided that if either of the male shareholders died, his spouse would be accorded the same rights given appellant.

Shortly after the execution of the two 1967 agreements, appellant became a paid employee, an officer, and a director of Steel City; she retained these positions for the next five years. During this period, she performed sporadic office duties, such as signing checks, answering phones, and sorting invoices, for which she received $150 per week in salary. She also received fringe benefits, including life and hospitalization insurance, a $30,000 surviving widow's benefit, and a share of profits under the September 29, 1967 agreement.[4] On September 5, 1972, John O'Farrell, Jr. notified his mother that he intended to exercise his option under the September 22, 1967 buy-sell agreement to purchase all her shares at book value. On September 7, 1972, John M. Cuddyre, Jr. notified appellant that he intended to exercise his alternate option to purchase her stock at book value if her son did not exercise his prior option. On September 8, 1972, appellant, through her counsel, sent her son a letter which denied that the 1967 buy-sell agreement created options which the individual appellees were entitled to exercise at that time. Appellant's letter, however, indicated that further negotiations might result in the transfer of her stock. If any negotiations between appellant, John O'Farrell, Jr., and John M. Cuddyre, Jr. then occurred, these negotiations did not culminate in a stock transfer.

On February 27, 1973, John M. Cuddyre, Jr., in his capacity as Steel City's president, wrote appellant that her employment with Steel City would terminate on March 15, 1973. At the next meeting of Steel City's three-person Board of Directors, John M. Cuddyre, Jr. and John O'Farrell, Jr. removed appellant from her position as a corporate officer; appellant dissented. However, appellant remains a member of the Board of Directors; she receives $300 annual remuneration for this service. She also receives her share of any dividends declared, including $10 per share in 1972, 1973, and 1974, as well as continuing life and hospitalization insurance coverage.

4. Appellant's share of the profits under this agreement totalled about $175,000 over the five year period.

On September 26, 1973, appellant filed a complaint in equity against John M. Cuddyre, Jr., John O'Farrell, Jr., Steel City, and the trustees of the Steel City Profit Sharing Plan. Appellant's complaint contained five counts. Count one, an assumpsit claim, charged that appellees breached the September 22, 1967 agreement by terminating appellant's employment despite the refusal of the individual appellees to buy her stock. Count two requested the chancellor to order the involuntary dissolution of the corporate appellee. Counts three and four charged that each individual appellee unlawfully reneged on his offer to purchase appellant's stock. Finally, Count five demanded that the trustees of the Steel City Profit Sharing Plan pay appellant the amount due her as a result of her vested interest in any early retirement plan.[5]

On March 3 and 4, 1976, the chancellor, HESTER, J. (now a member of this Court), conducted a hearing. John M. Cuddyre, Jr. and John O'Farrell, Jr. testified about their understanding of the operation of the 1967 buy-sell agreement. Both testified that they entered into this agreement in order to help out appellant financially for the five year period following her husband's death. Under the agreement, appellant only had a right to retain her stock and to serve as a corporate employee for the five year period. The parties contemplated that sometime during this five year period, appellant and her son would arrange the transfer of her stock at a mutually agreeable price, not necessarily book value. If a sale of her stock to either her son or Mr. Cuddyre could not be effected, appellant would be free to sell her stock to whomever she desired.

Samuel Sciullo, a lawyer, testified that he drafted the 1967 buy-sell agreement and that he represented all parties

---

5. Appellees subsequently conceded that under the Steel City profit-sharing plan, appellant's interest in retirement benefits totalling $22,-598.40 had vested. Apparently satisfied with this concession, appellant has not further pursued this count of the complaint. Accordingly, we will not address this contention again and all references to appellees herein will not include the trustees of the Steel City profit-sharing plan.

to the transaction. He confirmed O'Farrell's and Cuddyre's account of the purposes and operation of the 1967 buy-sell agreement. In particular, he testified that the individual appellees in effect had agreed to "carry" appellant for a five year period after which appellant's connection with the corporation as an employee and stockholder would terminate. If either her son or Cuddyre refused to exercise his option to buy her stock, she could sell her stock to someone outside the corporation.

Anna O'Farrell testified that she believed the 1967 buy-sell agreement obligated either her son or John M. Cuddyre, Jr. to purchase her stock at book value at the end of the five year period. Despite her willingness to effectuate this transfer, appellees had refused to pay the book value of the stock. Instead, when appellant refused to sell her stock at a reduced purchase price, appellees threatened to "freeze her out." As part of the attempt to isolate appellant, appellees fired her and cut off all employment-related benefits.

On January 26, 1977, the chancellor entered a decree nisi denying appellant's various requests for relief. On June 17, 1977, a court en banc denied appellant's exceptions to the chancellor's adjudication and entered a final decree confirming the decree nisi. This appeal followed.

Appellant first contends that the chancellor erred in failing to find that the individual appellees breached the September 22, 1967 buy-sell agreement by firing her despite their refusal to purchase her stock. The portion of the agreement relevant to this contention provides:

"4. In the case of Anna O'Farrell, it is agreed that she shall be permitted to retain the interest of her deceased husband, John O'Farrell, Sr., which title vested in her exclusively by operation of law, by virtue of said stock having been held as tenants by the entireties, <u>for a period not to exceed Five (5) years from the date of this agreement.</u> [emphasis in original]

"*During such time* [emphasis added], Anna O'Farrell shall be entitled to participate fully in the distribution of profit of

said business, and to become a paid employee of the corporation if she so desires such employment." According to appellant, the phrase "during such time" refers to the period during which appellant continued to hold her stock, regardless of whether this period exceeded the specified five year period. Appellees respond, and the lower court so held, that "during such time" refers to the immediately preceding underlined phrase "for a period not to exceed Five (5) years from the date of this agreement." Consequently, the lower court held that appellees could fire appellant upon the expiration of the five year period. We agree.

In construing a contract, a court's paramount consideration is the intent of the parties. If the language of the contract is unambiguous and susceptible of only one interpretation, a court will determine the parties' intention on the basis of the clear wording of the contract. If the language of the contract is ambiguous and susceptible of two interpretations, then the court will adopt the interpretation which, under all the circumstances, ascribes the most reasonable, probable and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished. In resolving an ambiguity, a court may consider parol testimony. *See Frickert v. Deiter Bros. Fuel Co.,* 464 Pa. 596, 601, 347 A.2d 701, 704 (1975); *United Refining Co. v. Jenkins,* 410 Pa. 126, 137–38, 189 A.2d 574, 580 (1963); *4 Williston on Contracts,* § 610B.

In the case at bar, we believe that the contract explicitly and unambiguously limited the duration of appellant's employment to a five year period. Moreover, even assuming the existence of the ambiguity which appellant detects, the parol evidence proffered by O'Farrell, Cuddyre, and Sciullo amply supported the lower court's conclusion that the parties intended to provide appellant with financial security *for a limited period of time.* Given this testimony, which the lower court believed, we will not disturb the lower court's manifestly reasonable interpretation of appellant's employment rights under the 1967 buy-sell agreement. Accordingly, appellant's termination after the five year period

was not improper, and appellant is not entitled to either reinstatement[6] or reimbursement for the loss of employment-related compensation and benefits.[7]

■ Appellant next contends that the September 22, 1967 agreement obligated the individual appellees to purchase her stock at book value upon the expiration of the five year period in September, 1972.[8] The lower court construed the agreement to afford the individual appellees *options* to buy appellant's stock at this time, rather than to impose an absolute obligation to buy the stock. Once again, the agreement's clear wording as well as the parol testimony of its signators supports the lower court's interpretation. Paragraph four of the agreement *entitles* appellant's son to purchase her stock upon the occurrence of specified conditions; if he fails to exercise his *right,* then the stock *shall become available* for purchase by John M. Cuddyre, Jr. Paragraph eight confirms the lower court's interpretation: if a party *entitled* to purchase stock under the agreement *relinquishes that right,* then the stockholder may attempt to sell his or her shares to third parties outside the corporation. As the chancellor reasonably concluded, these provisions, read together, bestow contractual rights, not obligations, upon appellees. Accordingly, the terms of the 1967 buy-sell agreement do not *require* the purchase of appellant's stock.[9]

6. Appellant did not request reinstatement at any time before the lower court. Therefore, even if appellant persuaded us to adopt her contractual interpretation, we would not order reinstatement. See *Dilliplaine v. Lehigh Valley Trust Co.,* 457 Pa. 255, 322 A.2d 114 (1974).

7. Appellant's right to share in Steel City's profits terminated when she ceased to be either an officer or employee of the corporation. Because her termination as an employee did not violate her contractual rights, appellant is not entitled to continued participation under the profit-sharing agreement.

8. See text of § 4 of the September 22, 1967 agreement on p. 3, supra.

9. Because we have concluded that appellees had no contractual obligation to purchase appellant's shares, we need not decide whether the 1967 buy-sell agreement contemplated a purchase price of book value rather than a negotiated price if one of the appellees exercised his option.

■ Alternatively, appellant asserts that even if the 1967 buy-sell agreement only grants each individual appellee an *option* to purchase her stock at book value, each individual appellee in fact exercised his option and is bound by his offer. In particular, appellant argues that her son's September 5, 1972 letter and John M. Cuddyre, Jr.'s September 7, 1972 letter constituted binding offers to purchase her stock at book value. Both letters state that each individual appellee wished to exercise his right under the 1967 buy-sell agreement to purchase her shares at book value. However, the record supports the chancellor's determination that appellant, through her attorney, rejected these offers by her September 8, 1972 letter. This letter specifically rejected the assertions of each individual appellee that he possessed an option to purchase appellant's stock at book value. However, if either appellee wished to continue negotiations, the letter indicated appellant's receptivity to further and presumably more attractive financial offers. Once appellant spurned the offers of the individual appellees to purchase her stock at book value, she could not later revive these offers and insist that each individual appellee comply with them.[10]

■ Finally, appellant contends that the chancellor erred in refusing to exercise his equitable powers to order the involuntary dissolution of appellee corporation. In pertinent part, 15 P.S. § 2107[11] permits the involuntary dissolution of a corporation when it appears:

10. *The facts of the instant case suggest a marked reversal in corporate fortunes sometime after September 8, 1972.* At some unspecified point after this date, appellant decided that book value was indeed a palatable purchase price. Accordingly, appellant attempted to hold appellees to their earlier offers. However, an offer to purchase, in the absence of a specified expiration date, remains open for only a reasonable time. See *In re Keifer,* 430 Pa. 491, 243 A.2d 336 (1968); *Textron, Inc. v. Froelich,* 223 Pa.Super. 506, 302 A.2d 426 (1973). Assuming that appellant did not reject the earlier offers, we note that appellant does not indicate the precise date she decided to "accept" appellees' offers. Thus, we cannot undertake to determine whether the offers to purchase had lapsed prior to her "acceptance."

11. The Act of May 5, 1933, P.L. 364, Art. XI, § 1107.

". . . (2) That the acts of the directors, or those in control of the corporation, are illegal, oppressive, or fraudulent, and that it is beneficial to the interests of the shareholders that the corporation be wound up and dissolved; or

"(3) That the corporate assets are being misapplied or wasted, and that it is beneficial to the interests of the shareholders that the corporation be wound up and dissolved; . . ."

In exercising its discretionary power under this section, the equity court should remember that involuntary dissolution is a drastic remedy to be employed cautiously and only in clear cases. *See* 16A Fletcher, Cyclopedia Corporations, § 8035 p. 42 (Supp.1977). *See also Commonwealth ex rel. v. United States Annuity Society,* 303 Pa. 19, 24, 154 A. 24, 25 (1931); *Commonwealth v. Monongahela Bridge Co.,* 216 Pa. 108, 116, 64 A. 909, 912 (1906); *Religious Press Assoc. v. Sunday School Times Co.,* 151 Pa.Super. 69, 29 A.2d 344 (1942).

■ Appellant essentially predicates her request for involuntary dissolution upon an alleged fraudulent and oppressive course of conduct by appellees designed to exclude her from all meaningful participation in Steel City's affairs and profits. *See* 15 P.S. § 2107A(2). In particular, appellant avers that the individual appellees pursued this fraudulent and oppressive goal by breaching the terms of the 1967 buy-sell agreement which required appellees to either buy appellant's stock at book value or to continue appellant's corporate employment indefinitely. We have already concluded that the 1967 buy-sell agreement did not *require* the individual appellees to buy appellant's stock or to refrain from terminating her position. In addition, the chancellor specifically found that the individual appellees terminated appellant not in retaliation for her failure to sell her stock at a reduced price, but in the good faith belief that the 1967 buy-sell agreement did not demand the continued employment and remuneration of a marginal contributor to the corporation's productivity. In short, the record supports the chancellor's conclusion that the individual appellees pursued

a course of conduct based on good faith and generosity rather than fraud and oppression.

While the above observations suffice to rebuff the main thrust of appellant's request for involuntary dissolution, appellant also directs our attention to some specific instances of alleged corporate waste. *See* 15 P.S. § 2107A(3). First, appellant points out that both individual appellees admitted using corporate labor and materials in constructing and improving their personal residences; these expenditures, dating back to 1967–1969, totalled $4,500. Second, appellant asserts, without elaboration, that appellees contravened federal wage and price controls by increasing their salaries in 1972 from $31,200 to $40,000; we will assume that this allegation is correct. By contrast, appellee corporation garners about $2,000,000 per year in gross income and possesses assets worth over $870,000. While we do not in any way condone appellee's past misapplications of corporate funds, these isolated comparatively minor and remote infractions alone do not compel the drastic remedy of dissolving a profitable corporation doing a heavy volume of business. Moreover, appellant has also reaped the benefit of corporate waste. For five years, she received a weekly salary and sizable fringe benefits in return for very little substantive work output, yet she did not complain about this example of corporate largesse. Under these circumstances we do not believe that the lower court abused its equitable discretion in refusing to order the involuntary dissolution of appellee corporation.[12] Because none of appellant's argu-

12. Appellant presents two other grounds in support of the requested involuntary dissolution; we may summarily dispose of both contentions. First, appellant alleges that the individual appellees misused corporation funds when they purchased life insurance policies on their lives, but not on appellant's life, for the purpose of allowing the corporation to purchase their stock upon their deaths. However, appellant signed the 1967 buy-sell agreement which specifically contemplated and approved this disparate treatment. Second, appellant contends that the corporation's failure to pay dividends in any years besides 1972–1974 necessitated dissolution. Because appellant did not present this claim in either her complaint or in exceptions to the chancellor's findings of fact and conclusions of law, she has waived this particular contention. See *Dilliplaine v. Lehigh Valley Trust Co.,* supra; Pa.R.Civ.P. 1518, 42 Pa.C.S. 1518.

ments is meritorious, we affirm the order of the lower court dismissing appellant's exceptions and entering a final decree.

Order affirmed.

The decision in this case was made prior to the retirement of HOFFMAN, J.

HESTER, J., did not participate in the consideration or decision of this case.